Charles F. ZIMMER, Plaintiff,
Stewart Marshall, Intervenor-Appellant,

v.

John J. McKEITHEN et al.,
Defendants-Appellees.

No. 71–2649.

United States Court of Appeals,
Fifth Circuit.

Sept. 12, 1973.

Stanley A. Halpin, Jr., Debra A. Millenson, George M. Strickler, Jr., New Orleans, La., for intervenor-appellant.

Frank R. Parker, Lawyers' Committee for Civil Rights Under Law, George Peach Taylor, Jackson, Miss., David Tatel, Lawyers' Comm., for Civil Rights Under Law, Washington, D. C., for amicus curiae.

William J. Guste, Jr., Atty. Gen. of La., Baton Rouge, La., William B. Ragland, Jr., Lake Providence, La., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLD-BERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

GEWIN, Circuit Judge:

Aristotle has written:

> If liberty and equality, as is thought by some, are chiefly to be founded in democracy, they will be best attained when all persons alike share in the government to the utmost.[1]

This case evokes a consideration of the extent to which the Constitution of the United States compels adherence to this principle. Specifically, we are called upon to determine under what circumstances an apportionment scheme operates to minimize or cancel out the voting strength of racial or political elements of the voting population.[2] Appellant contends that the district court order, affirmed by a majority of a panel of this court, 467 F.2d 1381, requiring reapportionment for the school board and police juries in East Carroll Parish[3] under an at-large scheme of elections cannot pass muster under the aforementioned standard. Both the district court and a majority of a panel of this court held that an at-large scheme cannot work a dilution of black voting strength where blacks, though constituting a minority of registered voters, comprise a majority of the total population of the parish.[4] Upon rehearing en banc, this court finds the aforementioned conclusion infirm, and therefore we vacate and remand the district court's judgment.

## I.

The panel opinion, recounting the facts which spawned this litigation and the protracted proceedings which it entailed, obviates the need for a full exposition of the present posture of this

---

1. Aristotle, Politics, Book II.

2. White v. Regester, 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973); Whitcomb v. Chavis, 403 U.S. 124, 143, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

3. In the absence of special legislative authority for school boards to apportion, the apportionment and reapportionment of parish

school boards is dependent upon such apportionment of the police jury in the parish. Consequently, this case does not require a distinction between the reapportionment scheme as it affects either body.

4. As shall be discussed *infra*, a majority of the panel refrained from announcing a per se rule. Rather, it qualified its application of the majority of population standards on the grounds proffered by appellees, namely the size of the parish.

case. Consequently, we shall highlight only those facts particularly germane to our disposition.

East Carroll is a rural parish located in the extreme northeast corner of Louisiana. According to the 1970 census, it has a population of 12,884, of which 7,568, or 58.7% are black. Until recently, blacks in the parish, like all blacks in Louisiana, suffered from the maintenance of dual school systems, and the interposition of an interpretation test which preconditioned qualification for voting. Additionally, from 1922 to 1962, no black resident of the Parish had been permitted to register to vote. With the removal of state and locally imposed impediments to voting, and through the efforts of federal registrars, registration statistics in the parish changed dramatically. As of October 6, 1971, there were 3,342 whites and 777 blacks registered on the East Carroll rolls and an additional 2,122 federally registered black voters in the parish.[5] Concurrent with the increased registration of black voters, elections under the predecessor ward system produced two black members of the policy jury and one black school board member.

The change from ward to at-large elections challenged herein was produced by the entry in 1968 of a district court order in a suit where petitioners sought to insure fidelity to the one-man, one-vote principle of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Three years elapsed between the entry of this order and the renewal of proceedings precipitated by instructions issued by the district court that East Carroll submit a reapportionment plan in light of the 1970 census. Pursuant to these instructions, the Parish Police Jury resubmitted the 1968 at-large plan for approval. Subsequently, appellant Marshall was permitted to intervene on behalf of himself and all other similarly situated black voters in East Carroll, and challenge the propriety of the at-large plan as contravening the fourteenth and fifteenth amendments of the Constitution and Section 5 of the Voting Rights Act of 1965.[6] After the hearing conducted on July 29, 1971, the district court found, *inter alia,* that since under the at-large plan, there was a zero population deviation, the at-large plan did not dilute the voting strength of the black population. Accordingly, the district court ordered that police jury and school board elections be conducted pursuant to an at-large scheme of voting under which the parish was divided into 7 wards. Under this scheme, 6 of the wards were to elect 1 representative to the police jury and school board, and 1 ward was to elect 3 representatives. Although candidates were required to reside in the ward from which they sought election, they were to be voted upon by registered voters in the entire county.

Marshall urged several grounds for reversal on appeal: first, that the district court was without power to order at-large elections because under Section 5 of the Voting Rights Act of 1965, the Attorney General of the United States had tendered an objection to the Louisiana Statutes which prescribed at-large elections for police juries and school boards;[7] second, that the district court

5. These figures are based on the 1962 findings of the district court in the voter registration suit brought in the Parish, United States v. Manning, 205 F.Supp. 172 (W.D. La.1962), and on the State of Louisiana Board of Registration, Report of Registered Voters, month ending October 6, 1971. *See* Brief of Appellant at 3, Zimmer v. McKeithen, No. 71–2649 (5th Cir. filed Dec. 1, 1971) ; Brief of Appellee at 1, *id.* (5th Cir. filed March 28, 1972).

6. Although Marshall clearly raised the Voting Rights Act issue in his Complaint in Intervention, the district court in its order in 1971 did not rule on this issue. Since he preserved this contention on appeal, it was before a panel of this court.

7. Until 1968, Louisiana law prohibited at-large elections for School Boards and Police Juries (the law required at least five wards from which the members of these bodies were to be elected). By Louisiana Acts of 1968 No. 445 Section 1 (amending La.R.S. 33:1221) and No. 561 (adding La.R.S. 17:71.1—17:71.6), Louisiana Law was amended to allow at-large elections (or elec-

applied an improper legal standard in evaluating dilution; and third, that the district court was clearly erroneous in finding that at-large elections do not dilute the voting strength of black voters in the parish. All three contentions were rejected by the panel.[8]

■■■ On rehearing, Marshall challenged the panel's disposition on all three grounds. Since we find his last two challenges meritorious, we need not consider his first contention concerning Section 5 of the Voting Rights Act of 1965.[9]

## II.

Before proceeding further, we feel it is important to emphasize the posture in which the issues are presented in the instant case. The panel understood Marshall to contend that the district court abused its discretion in adopting a plan that did not comport with Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). We do not understand Marshall to make this contention. Consequently, we need not consider whether, absent an allegation that an at-large scheme unconstitutionally dilutes the voting strength of a minority, the district court's approval of an at-large scheme would amount to an abuse of discretion under *Connor*.

Marshall's contention here is that the judicially approved at-large plan is unconstitutional,[10] not merely indiscrete. Having identified Marshall's contention, we turn to a consideration of first, the proper standard for testing dilution, and second, whether the district court erred in finding that there was no dilution in the instant case.

■■ We begin by noting that the concept of population in fair representation cases is not possessed of any talismanic quality. The Supreme Court recently affirmed this proposition in Gaffney v. Cummings, where it stated that "if it is the weight of a person's vote that matters, total population—even if stable and accurately taken—may not actually reflect that body of voters whose votes must be counted and weighed for purposes of reapportionment, because 'census persons' are not voters." [11] Indeed,

---

tions from less than five wards) for School Boards and Police Juries.

On April 29, 1969, Acts 445 and 561 were submitted to the Attorney General of the United States pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. On June 26, 1969, both Acts were rejected as having "the effect of discrimination against Negro voters on account of their race, and of denying to them an effective voice in the selection of Police Jury and School Board members." On September 10, 1969 this rejection was reaffirmed by the Attorney General of the United States, citing as a specific example of racial discrimination, the at-large scheme of elections in East Carroll Parish.

8. In all deference to the panel, we submit that they failed to give adequate consideration to Marshall's contention that the district court's finding of no dilution was clearly erroneous.

9. Marshall contended that the rule of Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971) and Sheffield v. Itawamba County Board of Supervisors, 439 F.2d 35 (5th Cir. 1971) that court ordered plans resulting from equitable jurisdiction over adversary proceedings are not controlled by

Section 5 is inapposite where such plans are adopted by a court in "sweetheart" lawsuits. Although there may be merit in his contention that the failure to qualify *Connor* and *Sheffield* may result in the circumvention of the Voting Rights Act, we would merely note that the dilution standard is a viable means of reconciling the disparate treatment of governmental body approved plans and court approved plans under Section 5. Furthermore, since Section 5, 42 U.S.C. § 1973c (1970), covers attempts to administer voting practices as well as attempts to enact them, see Roman, Section 5 Of The Voting Rights Act: The Formation of an Extraordinary Legal Remedy, 22 Am.U.L.Rev. 111, 124 (1972), the panel's decision that Connor and *Sheffield* govern is quite appropriate.

10. A similar contention was made in Gunderson v. Adams, 328 F.Supp. 584 (S.D.Fla. 1970) aff'd, 403 U.S. 913, 91 S.Ct. 2225, 29 L.Ed.2d 692 (1971) where a Florida plan, codifying a court ordered plan, was challenged and upheld.

11. Gaffney v. Cummings, 412 U.S. 735–746, 93 S.Ct. 2321, 2328, 37 L.Ed.2d 298, 308 (1973). Thus, census figures include aliens, nonresident military personnel, nonresident students, all of whom may be ineligible to vote.

Reynolds v. Sims, *supra* and its progeny [12] marked a departure from statistical niceties. Consequently, to rely upon population statistics, to the exclusion of all other factors, is to give these statistics greater sanctity than that which the law permits or requires.

More fundamentally, the application of the population measure to this case is premised upon a misunderstanding of the thrust of the dilution problem presented in this case. Inherent in the concept of fair representation are two propositions: first, that in apportionment schemes, one man's vote should equal another man's vote as nearly as practicable; [13] and second, that assuming substantial equality, the scheme must not operate to minimize or cancel out the voting strength of racial elements of the voting population. Both the Supreme Court and this court have long differentiated between these two propositions. [14] And although population is the proper measure of equality in apportionment, in Whitcomb v. Chavis, 403 U.S. 124, 149–150, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) and White v. Regester, *supra*, 412 U.S. at 765, 93 S.Ct. at 2339, 37 L.Ed.2d at 324, the Supreme Court announced that access to the political process and not population was the barometer of dilution of minority voting strength.

The district court applied a per se rule that since blacks were a majority in East Carroll Parish, the at-large plan could not possibly submerge their vote. Since in White v. Regester, *supra*, the Supreme Court affirmed a district court's finding of dilution in Bexar County even though Mexican-Americans comprised a numerical majority of the population in that county, the per se rule applied by the district court below cannot withstand scrutiny. The panel also relied upon the fact that blacks in East Carroll comprised a majority of population in reaching its conclusion, but pointing to the size of the parish's population, it qualified the standard applied by the district court. We feel that this qualification, invoked to differentiate the instant case from Connor v. Johnson, 402 U.S. 690, 692, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971) where the Supreme Court announced a preference for single-member districts in "large" districts, is of no moment where, as here, a showing of dilution has been made. The legal standards announced by the Supreme Court in Whitcomb v. Chavis, *supra*, and White v. Regester, *supra* in determining submergence admit of no distinction on the basis of size of population alone.

Concededly, in Whitcomb v. Chavis, *supra*, 403 U.S. at 143–144, 91

The Supreme Court and lower courts have approved apportionment based not on population but on voter registration statistics on several occasions, where such data produces a distribution of legislators not differing substantially from the use of a permissible population basis. *See, e. g.*, Burns v. Richardson, *supra*, 384 U.S. at 93, 86 S.Ct. 1286; Ely v. Klahr, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971); Reynolds v. Gallion ex rel. Attorney General of Alabama, 308 F.Supp. 803 (M.D.Ala.1969); Pate v. El Paso County, Texas, 337 F.Supp. 95 (W.D. Tex.) aff'd, 400 U.S. 806, 91 S.Ct. 55, 27 L. E.2d 38 (1970).

12. E. g., Gaffney v. Cummings, *supra*; White v. Regester, *supra*; Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); Swann

v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L. Ed.2d 501 (1967).

13. Reynolds v. Sims, *supra*, 377 U.S. at 577, 84 S.Ct., at 1389.

14. *See* Gaffney v. Cummings, *supra*, 412 U.S. at 751, 93 S.Ct. at 2330, 37 L.Ed.2d at 311; White v. Regester, *supra*, 412 U.S. at 765, 93 S.Ct. at 2339, 37 L.Ed.2d at 324; Whitcomb v. Chavis, *supra*, 403 U.S. at 142, 91 S.Ct. 1858, 29 L.Ed.2d 363; Abate v. Mundt, *supra*, 403 U.S. at 184 n.2, 91 S.Ct. 1904; Burns v. Richardson, *supra*, 384 U.S. at 88–89, 86 S.Ct. 1286; Howard v. Adams County Board of Supervisors, 453 F.2d 455, 457 (5th Cir. 1972) cert. denied, 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972). *See also* Troxler v. St. John the Baptist Parish Police Jury, 331 F.Supp. 222 (E.D.La.1971), appeal dismissed, 452 F.2d 1388 (5th Cir. 1972).

S.Ct. 1858, the Supreme Court acknowledged that the aggregation of several districts into multi-member districts or an at-large scheme may enhance the potential for dilution when the population of such districts is large. But just as the magnitude of the districts did not obviate the need for petitioners to satisfy their burden of proof in *Whitcomb*, the minuteness of the population in the instant case cannot be invoked to pretermit further inquiry into the possibility of dilution in East Carroll Parish. The import attributed to population by the majority of the panel had this preclusive effect. However, we cannot sanction the view that minorities are to be exposed and subject to apportionment schemes otherwise constitutionally infirm because the equal protection clause can be watered down on the basis of population statistics alone.[15]

 We also hold that the district court erred in finding that the at-large plan did not dilute the black vote in East Carroll. In Howard v. Adams

County Board of Supervisors, *supra*, 453 F.2d at 457, this court stated that to establish the existence of a constitutionally impermissible redistricting plan, plaintiffs must maintain the burden of showing either first, a racially motivated gerrymander, or a plan drawn along racial lines, or second, that ". . . designedly or otherwise, a[n] . . . apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." In view of our holding that Marshall satisfied the burden with respect to the second standard, we need not entertain his contention that the departure from the firmly entrenched state policy against at-large voting in elections in police juries and school boards comes within the first standard.[16]

 It is axiomatic that at-large and multi-member districting schemes are not per se unconstitutional.[17] Nevertheless, where the petitioner can dem-

---

15. We acknowledge, however, that elections with respect to certain special governmental units of limited purpose are not subject to the fair representation mandates. *See* Associated Enterprises, Inc. v. Toltec Watershed Improvement District, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973); Salyer Land Company v. Tulare Lake Basin Water Storage District, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973).

16. Similar contentions have met with varying degrees of success. For cases upholding the claim that a reapportionment plan was racially discriminatory, *see* Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Smith·v. Paris, 257 F.Supp. 901, 904 (M.D.Ala.) modified and aff'd, 386 F.2d 979 (5th Cir. 1967) on remand, United States v. Democratic Executive Committee of Barbour County, Alabama, 288 F.Supp. 943 (M.D.Ala.1968); Sims v. Baggett, 247 F.Supp. 96, 110 (M.D.Ala.1965). For cases in which such a claim was rejected, *see* Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); Holt v. Richmond, 459 F.2d 1093 (4th Cir.)., cert. denied, 408 U.S. 931, 92 S.Ct. 2510, 33 L.Ed.2d 343 (1972).

Neither the language quoted from Howard v. Adams County Board of Supervisors, *supra*, nor the aforementioned cases should be read to hold that a reapportionment plan

can be invalidated solely because of the racial motivations of those who fashioned it. In Palmer v. Thompson, 403 U.S. 217, 224–225, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the Supreme Court stated that although its past decisions contain language which suggests that motive or purpose behind a law is relevant to its constitutionality, these decisions, including Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) focused on the actual effect of the legislation being challenged, and not the reason why the legislation was enacted.

17. White v. Regester, *supra*, 412 U.S. at 765, 93 S.Ct. at 2339, 37 L.Ed.2d at 324; Mahan v. Howell, *supra*, 410 U.S. at 335, 93 S.Ct. 979; Ferrell v. Hall, 339 F.Supp. 73 (W.D. Okl.) aff'd, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328, petition for rehearing denied, 408 U.S. 932, 92 S.Ct. 2489, 33 L.Ed.2d 344 (1972); Gunderson v. Adams, 328 F.Supp. 584 (S.D.Fla.1970); aff'd, 403 U.S. 913, 91 S.Ct. 2225, 29 L.Ed.2d 692 (1971); Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed. 2d 656 (1967); Kilgarlin v. Hill, 386 U.S. 120, 121, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); Burns v. Richardson, *supra*; Fortson v. Dorsey, *supra*; Lipscomb v. Jonsson 459 F.2d 335, 337 (5th Cir. 1972); Howard v. Adams County Board of Supervisors, *supra*, 453 F.2d at 457–458.

onstrate that "its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice," White v. Regester, *supra*, 412 U.S. at 766, 93 S.Ct. at 2339, 37 L.Ed.2d at 324, Whitcomb v. Chavis, *supra*, 403 U.S. at 149–150, 91 S.Ct. 1858, such districting schemes are constitutionally infirm.

The Supreme Court has identified a panoply of factors, any number of which may contribute to the existence of dilution. Clearly, it is not enough to prove a mere disparity between the number of minority residents and the number of minority representatives.[18] Where it is apparent that a minority is afforded the opportunity to participate in the slating of candidates to represent its area, that the representatives slated and elected provide representation responsive to minority's needs, and that the use of a multi-member districting scheme is rooted in a strong state policy divorced from the maintenance of racial discrimination, Whitcomb v. Chavis, *supra,* would require a holding of no dilution. *Whitcomb* would not be controlling, however, where the state policy favoring multi-member or at-large districting schemes is rooted in racial discrimination.[19] Conversely, where a minority can demonstrate a lack of access to the process of slating candidates,[20] the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the

existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts.[21] The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in White v. Regester, *supra,* demonstrates, however, that all these factors need not be proved in order to obtain relief.

In *White,* the Supreme Court sustained the district court's invalidation of a multi-member districting scheme for the election of representatives to the Texas House of Representatives from Dallas and Bexar Counties. The Court held that the following findings of fact made by the district court concerning Dallas County were sufficient to warrant the relief fashioned: first, that the blacks had suffered a history of official racial discrimination which touched their right to participate in democratic processes; second, that the Texas requirements for majority vote as a prerequisite to nomination in a primary, though not themselves improper, enhanced the opportunity for racial discrimination; and third, that black candidates had merely nominal success in the past in electing Representatives due to the indifference of the Democratic Party which controlled candidate-slat-

18. *E. g.,* Whitcomb v. Chavis, *supra,* at 149, 91 S.Ct. 1858; Lipscomb v. Johnson, *supra,* 459 F.2d at 337.

19. Taylor v. McKeithen, 407 U.S. 191, at 194, 92 S.Ct. 1980, at 1982, 32 L.Ed.2d 648, at 650, n. 3. *See* Parker, County Redistricting in Mississippi: Case Studies in Racial Gerrymandering, 44 Miss.L.J. 391, 400 (1973).

20. The Supreme Court's focus in Whitcomb v. Chavis, *supra,* 403 U.S. at 149–150, 91 S. Ct. 1858, on the access of minorities to slating procedures in Marion County, Indiana, makes clear that the standards we

enunciate today are applicable whether it is a specific law or a custom or practice which causes the diminution of minority voting strength.

21. *Compare* Whitcomb v. Chavis, *supra,* 403 U.S. at 143–144, 91 S.Ct. 1858, 29 L.Ed.2d 363, *with* Graves v. Barnes, 343 F.Supp. 704, 725 (W.D.Tex.1972), aff'd sub nom. White v. Regester, *supra.* The existence and mode of operation of voting procedures which enhance dilution is outlined in Derfner, Racial Discrimination and the Right to Vote, 26 Vand.L.Rev. 523, 553–55 and accompanying notes (1973).

ing in Dallas County. White v. Regester, *supra,* 412 U.S. at 766–767, 93 S.Ct. at 2339–2340, 37 L.Ed.2d at 324–325. With respect to Bexar County, the district court made similar findings concerning the history of discrimination against Mexican-Americans and the unresponsiveness of the Bexar County legislative delegation to the interests of Mexican-Americans. The Supreme Court held that the district court's findings were sufficient to sustain the relief awarded in Bexar County. White v. Regester, *supra,* 412 U.S. at 767–769, 93 S.Ct. at 2340–2341, 37 L.Ed.2d at 325–326. While the instant case is not on all fours with White v. Regester, we hold that the record reveals facts sufficiently within its purview to warrant a repudiation of at-large elections in East Carroll Parish.

As in Dallas and Bexar Counties, minority residents in East Carroll Parish have suffered from a protracted history of racial discrimination which touched their ability to participate in the electoral process. Until 1957, they were compelled by a statute of statewide application to attend racially segregated schools until this court took action in Orleans Parish School Board v. Bush, 242 F.2d 156 (5th Cir.), cert. denied, 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957). Less overt but equally invalid statewide schemes which fostered the maintenance of dual schools were operative until thwarted in 1960.[22] Until 1965, voters in East Carroll were subject to a state-required interpretation test in

order to qualify to vote.[23] Finally, from 1922 to 1962, no black had been permitted to register to vote in the Parish.[24] Concededly, these impediments to participation in the electoral process have since been removed. The district court concluded that their removal vitiated the significance of the showing of past discrimination. This conclusion is untenable, however, precisely because the debilitating effects of these impediments do persist. *Cf.* Graves v. Barnes, 343 F. Supp. 704, 733 (W.D.Texas 1972), aff'd sub nom. White v. Regester, *supra.* Their persistence is manifested, in part, by the fact that although blacks in East Carroll comprise a majority of the population, they constitute a minority of registered voters.

Similarly, as in Dallas and Bexar Counties, the electoral device of a majority voting requirement is operative in East Carroll Parish.[25] This device has been severely criticized as tending to submerge a political or racial minority. Graves v. Barnes, *supra* at 725, aff'd sub nom. White v. Regester, *supra.* *See also* Evers v. State Board of Election Com'rs, 327 F.Supp. 640, 643 (S.D. Miss.1971). This criticism is appropriate in the instant case.

The only distinction between the instant case and White v. Regester, *supra,* is that here, there is no proof that representatives of police juries and school boards in East Carroll were particularly insensitive to the interests of minority residents. While this distinction is significant, it is not decisive.[26]

---

22. *See, e. g.,* Bush v. Orleans Parish School Board, 188 F.Supp. 916, 920 (E.D.La.1960) (documenting additional circumventive artifices).

23. Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

24. United States v. Manning, *supra.*

25. La.Rev.Stat.Ann. art. 18, § 18:358 (1969). In addition, voters in East Carroll are subject to anti-single shot voting requirements, the effects of which though mitigated as to wards 1, 2, 4, 5, 6 and 7 under the district court's plan, are still egregious in ward 3 where 3 representatives to the police jury

and school board are elected. *See* La.Rev. Stat.Ann. art. 18, § 18:351 (1969).

26. It may be that the absence on the record of any criticism of the responsiveness of the police jury and school board is attributable to an omission of proof. If so, our decision should not be interpreted as acquiescing to such omissions. However, it may be that the particular functions of the police jury, for example, do not easily lend themselves to unresponsive representation. The record establishes that the primary function of the juries is the drainage of rural farmlands, maintenance of rural roads, and the overseeing of a prison farm. Were we to hold that

We feel that this deficiency in proof is compensated for by an additional distinction between the circumstances in the instant case and *White*. In Dallas and Bexar Counties, there was a strong tradition of multi-member districting. In contrast, in East Carroll, the firmly entrenched state policy against at-large elections for police juries and school boards had persisted until as late as 1967. Moreover, although testimony elicited by the district court emphasized the fact that the problems confronting the police jury were parish-wide and hence could best be resolved by representatives sensitive to a parish-wide electorate, there is a dearth of evidence that would suggest that the police jury formerly elected by wards inadequately served parish-wide interests in the past. Indeed, we find it rather anomalous that appellees would contend that the parish is too small for there to be a dilution of minority votes under an at-large scheme, and yet too large for ward elected representatives to be responsive to parish-wide interests.

Thus, on the basis of the evidence adduced on the record, we feel constrained to find that the district court erred in rejecting Marshall's contention that the at-large electoral scheme would work a diminution of the black voting strength in East Carroll Parish. The confluence of factors presented in the instant case bring it well within the Supreme Court's holding in White v. Regester, *supra.*

Although the aforementioned analysis suffices to sustain our disposition, we are inclined to respond to an additional argument tendered by appellee in support of the panel's ruling. While acknowledging that the instant facts might theoretically present a case of dilution, appellee argued that 1971 and 1972 elections under the at-large plan, with the attendant success of 3 black candidates, dictated a finding that

the at-large scheme did not in fact dilute the black vote. The significance attached to success at the polls in the instant case is unavailing, however, for two reasons. First, these results were not before the district court when it rendered the opinion we are presently reviewing. It is axiomatic that an appellate court cannot take cognizance of matters not passed upon by the trial court. Second, we cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the black vote. Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds. In either situation, a candidate could be elected despite the relative political backwardness of black residents in the electoral district. Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution. This we choose not to do. Instead, we shall continue to require an independent consideration of the record.

### III.

We conclude our analysis in this case by returning to the point at which we began when we noted that this is not a case wherein a district court reapportionment plan approving at-large elections is challenged merely as an abuse of discretion. Where such a challenge is registered, our starting point would be Connor v. Johnson, *supra,* in which the Supreme Court announced that single-member districts are prefera-

the absence of a claim of representation unresponsive to a minority's needs foreclosed constitutional attack, the voting strength of minorities could be freely diluted without

fear of constitutional restraint. The absence of proof with respect to school boards could not be explained on such grounds.

ble to large multi-member districts. This preference is not, however, an unyielding one. As the Supreme Court admonished in Whitcomb v. Chavis, *supra*, 403 U.S. at 161, 91 S.Ct. at 1878, 29 L. Ed.2d 363, "[t]he remedial powers of an equity court must be adequate to the task, but they are not unlimited." Lest our decision today be misconstrued to narrowly circumscribe the discretion of a district court in fashioning a reapportionment plan itself free from constitutional infirmity, we would note that the preference for single-member districts may yield in two situations.

Where a district court determines that significant interests would be advanced by the use of multi-member districts and the use of single-member districts would jeopardize constitutional requirements, it can employ multi-member districts. *See* Mahan v. Howell, *supra*, 410 U.S. at 334–335, 93 S.Ct. 979, 35 L.Ed.2d 320. But these significant interests must not themselves be rooted in racial discrimination. *Cf.* Taylor v. McKeithen, *supra*, 407 U.S. at 194, 92 S.Ct. at 1982, 32 L. Ed.2d at 650 n. 3; White v. Weiser, 412 U.S. 783, 796, 93 S.Ct. 2348, 2355, 37 L. Ed.2d 335, 347 (1973).

The preference may also yield where a district court determines that multi-member districts afford minorities a greater opportunity for participation in the political processes than do single-member districts. In the process of making such a determination, a court need not be oblivious to the existence and location of minority voting strength.[27] While not required to formulate a plan that assures the success of a minority at the polls, a court may in its discretion opt for a multi-member plan which enhances the opportunity for participation in the political processes.

We acknowledge that the legal standards fashioned in this area of the law require federal courts to engage in a particularly exacting and hazardous inquiry in order to divine the proper remedial action to be taken. Justice Stewart presaged what we today acknowledge in his dissent in Sixty-Seventh Minnesota State Senate v. Beens, 406 U.S. 187, 204, 92 S.Ct. 1477, 1487, 32 L.Ed.2d 1, 14 (1972), when he noted that "the federal courts are often going to be faced with hard remedial problems" in reapportionment cases. Nevertheless, we are confident that federal courts can come to grips with such problems.

For the reasons set forth above, we reverse the decision of the panel of this court and vacate and remand the judg-

---

27. The Supreme Court has never ruled on the question of the extent to which the board equitable powers of a federal court in fashioning reapportionment decrees are limited by the colorblind concept of Gomillion v. Lightfoot, *supra* and Wright v. Rockefeller, *supra*. *See* Taylor v. McKeithen, *supra*, 407 U.S. at 194, 92 S.Ct. at 1982, 32 L.Ed.2d at 650. Several courts have intimated that the colorblind concept is in fact a limitation. *See* Mann v. Davis, 245 F.Supp. 241, 245 (E.D.Va.) aff'd sub nom. Burnette v. Davis, 382 U.S. 42, 86 S.Ct. 181, 15 L.Ed.2d 35 (1965); Ferrell v. Hall, 339 F.Supp. 73, 83 (W.D.Okla.) aff'd, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328; rehearing denied, 408 U.S. 932, 92 S.Ct. 2489, 33 L.Ed.2d 344 (1972).

In discussing the remedial power of federal courts to fashion reapportionment decrees, the Court has cited Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), see, e. g., Taylor v. McKeithen, *supra*, 407 U.S. at 194, 92 S. Ct. at 1982, 32 L.Ed.2d at 650; Sixty-Seventh Minnesota State Senate v. Beens, *infra*, 406 U.S. at 201, 92 S.Ct. at 1486, 32 L.Ed.2d at 12 (Stewart, J., dissenting), thereby suggesting that such powers in fashioning reapportionment decrees are coterminous with those in fashioning desegregation decrees. Since *Swann* noted that it was permissible for a federal court to consider race in the latter situation, *Swann*, *supra*, 402 U.S. at 25, 91 S.Ct. 1267, it would also be permissible to consider race in the former situation.

Our decision in Howard v. Adams County Board of Supervisors, *supra* is not inconsistent with the view maintained herein. In Howard, we observed that the district court was correct in noting that the organization commissioned by the legislature to draw up reapportionment plans did not consider race in its plan. Howard, *supra*, 453 F.2d at 458. We did not intimate any view as to the propriety of considering race in such circumstances.

ment of the district court for proceedings consistent with our disposition.

COLEMAN, Circuit Judge, with whom INGRAHAM, Circuit Judge, joins (dissenting in part):

On November 17, 1972, a majority of the Judges ordered this case reheard en banc, directing counsel to file through briefs on the issue of "dilution of the franchise of black voters" as raised in the District Court and considered by the panel decision.[1] Clearly, what the en banc court intended to do was to establish some standards as to what is required to "minimize or cancel out black voting strength",[2] particularly in the context of a sparsely settled governmental unit inhabited by less than 13,000 people.

With sincere deference, I fear that the intended objective has eluded the en banc opinion. Regretfully, it leaves me with no plainly discernible idea of what the District Courts are hereafter to do with this troublesome problem. Moreover, I must disagree with the effect of those portions of the opinion which I think I do understand.

The opinion appears to be anchored, in the main, on the recent decision of the Supreme Court in White v. Regester, dealing with conditions prevailing as to the multi-member legislative districts in Dallas and San Antonio. East Carroll Parish, Louisiana, however, is a "far cry" from either of these highly populated metropolitan areas. The Parish Seat, Lake Providence, has a population of 6,183. The remaining 450 square miles of typical rural delta terrain have 6,701 inhabitants, with an average population density of fifteen persons (not voters) per square mile. In East Carroll blacks are in a heavily preponderant majority, not in the minority as were the blacks and Mexican-Americans in Dallas and San Antonio. In *White,* the Supreme Court considering the *totality of the cir-*

*cumstances,* was not inclined to disturb the findings of the Three Judge District Court that certain conditions in the cities had led to invidious discrimination against the minority groups. In the instant appeal, the en banc majority holds a non-cancellation, non-minimization finding of the District Court to be clearly erroneous.

Let us now turn to the undisputed facts in the case presently before us.

In round figures, the Parish population is 59% black and 41% white; the voting registration is 54% white and 46% black. *The record fails to reflect the number of eligible blacks who have chosen not to register.*

With a spread of only eight percentage points between white and black registration, even in an election conducted solely on racial considerations a switch of less than five percent would reverse the expected outcome. Does such a *thin line,* even in a formerly segregated jurisdiction, amount as a matter of law to impermissible "minimization" or "cancellation" of black voting strength? I would respond in the negative, but the en banc opinion says "yes"; that any other view is clearly erroneous. Of course, divergencies of such size in constitutionally mandated population reapportionments at state and local levels do not call for per se invalidation, White v. Regester, *supra.*

One of the factors stressed in White v. Regester was that for nearly a hundred years only two minority representatives from Dallas County and only five Mexican-Americans from Bexar County had been elected to the Texas Legislature. I do not know how many had been candidates nor what qualifications they possessed, but in East Carroll the en banc opinion declines to consider the unchallenged fact that in the at-large elections in East Carroll Parish in 1971 and 1972 three black candidates were elected

---

1. The panel opinion in this case (Judge Gewin dissenting in part) is reported, 467 F.2d 1381.

2. Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376; Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401.

to office, including one who previously had been defeated when running in his own ward. The opinion holds that an appellate court cannot take cognizance of matters not passed upon by the trial court. It was all right for the Supreme Court to consider election results in Dallas and Bexar for the past one hundred years but when it comes to dismembering a little parish we must blind ourselves to facts asserted on oral argument and not in the least disputed. One rule for plaintiffs and the opposite for defendants. I might add that in the eight years I have served on this Court I have frequently seen it go outside the formal record in racially oriented cases for the reason that it would not blind itself to unchallenged facts.

Obviously, the election of three black candidates in at-large elections within two years after the adoption of the plan now under review, and at a time when black registration amounted to 46% and white registration came to 54%, pretty well explodes any notion that black voting strength has been cancelled or minimized. What the en banc opinion condemns as clearly erroneous turns out to be clearly right when put to the test of actual use at the ballot box rather than in the rarified atmosphere of the judicial chamber.

Additionally, in White v. Regester, the at-large candidates for the legislature were not required to live in a particular zone, so that it was possible for every legislator to be elected from outside the minority areas. Indeed, the Three Judge Texas District Court felt impelled to say, and the Supreme Court quoted it, that these legislators were "insufficiently responsive to Mexican-American interests".

In East Carroll Parish, however, the candidates were required to run from specifically designated areas.

I believe that White v. Regester was decided on the denial of access to the political process, not on cancellation or minimization of the minority vote. In any event, a decision rendered on the facts peculiar to that case and not shown to exist in East Carroll provides faint precedential support for the en banc decision now about to be rendered.

In East Carroll Parish the black people hold a predominant population majority—59% to 41%. It necessarily follows that the opinion of the Court in this case can only mean that in formerly "segregated" areas a black population majority is of no consequence in one man-one vote reapportionment cases unless it is also matched by a black registration majority when there is an effort to escape from the pocket borough method of electing county officials. The basic requirement, the fundamental goal, of population equality must yield to registration equality.

I submit that this is a serious distortion of the one man-one vote principle. It has to be premised on the idea that voters will always vote for candidates of their own race, an idea which has repeatedly failed the test of electoral experience, even in East Carroll Parish itself. It also overlooks the absolute certainty that with such a predominantly heavy population majority it is only a matter of time, and not too long at that, when there will be a black registration majority in East Carroll.

The en banc opinion is quite inconclusive as to what the District Court must do on remand. Apparently, however, no choice is left but to direct the division of the Parish into wards (districts). The Balkan must be fragmented into nine Balkans. After it had lost jurisdiction in this case, as set forth in the panel opinion, the District Court approved a redistricting plan submitted by the plaintiff-appellants by which three of the nine board members would be elected from one ward while the other six wards would be allowed to elect only one each. One ward would elect ⅓ of the Board while the other six would elect ⅑ each. So far as ultimate power on the Board

is concerned a vote in one ward would be worth exactly three times that of a vote in any other ward. To me that certainly smells of invidious discrimination and a complete distortion of the one man-one vote rule within a small county area.

The paramount consideration in this case is that in East Carroll Parish, Louisiana, the black race is a definite majority, not a minority.[3] Thus, the ultimate question is whether a 7% deficit in black registration cancels or minimizes the black voting strength of those who hold an 18% advantage in population. The en banc opinion says that it does, as a matter of law, and that the affirmative finding of the District Court to the contrary is clearly erroneous.

Hence, we direct a change in the election machinery of a small rural parish, where the black officials elected under the old malapportioned ward plan expressed, as the record shows, a preference for the at-large plan.

I would adhere to what the panel said originally:

"We are unable to see how at-large elections in this small parish could possibly discriminate against its black citizens. They have a commanding majority of the total population. This majority would participate in the election of not one but of every police juror and every school board member in the parish. Every elected official would thus be answerable to all black citizens of the entire parish. On a single-member district plan, if such can be devised, the voters would have a voice in the election of only one member on the police jury or the school board. It would, therefore, be just as easy to say, in the exercise of discretion, that a single district plan in this parish would more clearly dilute the voting power of the blacks than would one in which every voter, black and white, has the same identical voice in

the selection of not one, *but all* members of the elective body. As a matter of fact, the District Judge so found."

To the extent indicated, I respectfully dissent.

CLARK, Circuit Judge, with whom DYER, LEWIS R. MORGAN and RONEY, Circuit Judges, join (dissenting):

The majority bases its reversal of the District Court order now on appeal on two grounds: first, the District Court improperly relied on population statistics alone in evaluating the effect of the plan ordered implemented in diluting the voting strength of black citizens and second, the District Court finding of no dilution was clearly erroneous. With deference, I differ as to both grounds. Of more fundamental importance is my disagreement with Part III of the majority opinion which creates a formula to test multimember district reapportionment plans for dilution of ethnic group voting strength. The tests laid down sweep too broadly and at least they are unnecessary in view of the clear exposition of the law in this field by the Supreme Court. For all of these reasons I respectfully dissent.

### I.

White v. Regester announces the legal standard to be applied in this case as succinctly and cogently as it can be put. Omitting supportive citations, the Court stated:

Plainly, under our cases, multimember districts are not *per se* unconstitutional, nor are they necessarily unconstitutional when used in combination with single-member districts in other parts of the State.

But we have entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups. To sustain such claims, it is not enough that the racial group allegedly

---

3. The en banc opinion speaks of single-shot voting, run-off elections, and slating candidates, but these were not issues in the court below.

discriminated against has not had legislative seats in proportion to its voting potential. The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

The Supreme Court concluded that "on the totality of the circumstances" it would not overturn the, findings of the District Court

representing as they do a blend of history and an intensely local appraisal of the design and impact of the Bexar County multi-member district in the light of the past and present reality, political and otherwise.

The majority epitomizes the District Court's order as one which based its determination of nondilution solely on the fact that the requirement of at-large elections eliminated any population deviation between voting units. However, I read the order to have a broader foundation. At the hearing held to determine the effect of the 1970 census upon the District Court's previous 1968 order for at-large elections, six plans were submitted to the court by the governmental agencies involved and by the black intervenor. None of these plans provided for single-member districts throughout the parish. Rather, they provided for various combinations of single and multimember districts and for various forms of parish-at-large elections with geographical residency requirements for the candidates for various posts. The evidence adduced during this hearing delved into what dilution would be brought about by the intervenor's proposed plans as compared with the dilution that would result from a parish-at-large reapportionment plan. Both forms of plans were also compared to the population proportions which existed under the pre-1968 single-member ward system.

The District Court's decree now on appeal provided in pertinent part:

. . . the court having considered all plans presented as well as all alternate plans proposed by the parties hereto, it has made the following finding of facts:

1. That according to the 1970 U.S. Census, East Carroll Parish has a total population of 12,884 persons of which number 7,568 are blacks and 5,306 are whites and other nationalities; that the black population of East Carroll Parish, Louisiana, comprises 58.7 percent of the total population.

2. That the plan of reapportionment offered by East Carroll Parish Police Jury and East Carroll Parish School Board is more satisfactory than other plans presented because it offers a zero deviation while all other plans considered did not.

3. That the plan of reapportionment offered by East Carroll Parish Police Jury and East Carroll Parish School Board does not dilute nor discriminate against the black population as the new voting unit from which officers of the jury and the board are to be elected is comprised of 58.7 percent blacks, or a substantial majority of blacks, while other plans considered diluted the black population of different areas within the parish significantly greater than the plan offered by the jury and school board.

4. That the plan recommended by East Carroll Parish Police Jury and East Carroll Parish School Board has actually been in effect in East Carroll Parish since December 2, 1968, and the plan has not proved discriminatory against blacks.

5. That the plan represents the wishes of both public bodies, having been endorsed by two of the three black public officials now serving on these public bodies.

6. That the plan of apportionment offered by East Carroll Parish Police

Jury and East Carroll Parish School Board is a constitutionally acceptable plan and meets all of the requirements of the "one-man, one-vote" rule of law.

7. That the evidence adduced by intervenor failed to show that the plan offered by the two aforesaid public bodies would discriminate against blacks or in any manner dilute the black population.

I read this order as addressing two separate considerations. The first is compliance with the one-man-one-vote mandate of Reynolds v. Sims. The second is a factual consideration of whether parish-at-large elections, which obviously solve this problem completely, might have the effect of diluting the voting strength of black voters who, while holding a majority position in total population, comprise a slight minority of the registered voters in the entire parish. Findings 3, 4, 5 and 7 are expressly addressed to this second problem, and, when considered in the context of the hearing record in this case which directly dealt with the dilution of voter effectiveness on a racial basis, appear to me to go to the heart of the proper questions that should concern the trier of fact in such a case. Certainly they are not limited to population statistics alone.

There can be no serious quarrel with the abstract legal premise that bare population statistics cannot become a talisman for determining whether dilution of voting strength has occurred. However, this concession is no impediment to an insistence that the District Court and the prior panel opinion of this court were entitled and indeed required to consider the overall size of the population in this small rural parish in approving the apportionment plan involved. It is perfectly valid to compare the effect which an at-large voting plan would have on the strength of an ethnic group in East Carroll Parish with the result of any similar multimember district plan in a populous urban area such as those which have been involved in the previous Supreme Court cases to date. The opportunity for participation in a parish-at-large election among less than 13,000 people is *greater* than the opportunity to be a meaningful part of the elective process in a single-member district which numbers over 100,000 persons. Judge Dawkins also made a specific oral finding that the proposed plan was not racially motivated and did not have a racially deterrent effect in its operation. With all of these factors which were before the District Court and which obviously formed a part of its decisional process, I cannot agree that the District Court imposed a constitutionally infirm reapportionment plan which watered down voting rights on the basis of population statistics alone.

The almost gossamer distinction between weighing each man's vote equally and preventing the dilution of the overall voting strength of an identifiable racial element within the electorate can be an elusive concept at best. However, it is not one which in my view escaped either the attention of Judge Dawkins in his original opinion or the panel that initially heard this appeal. With full recognition that White v. Regester and the other precedents cited in footnote 2 of the en banc majority opinion discuss a panoply of factors which may help identify the existence of dilution, I find no rule requiring that every such factor must be tested for and found in every case in which a dilution issue may be raised. The common denominator which all precedents demand be weighed in reaching the required ad hoc fact adjudication is: has the plaintiff met the burden of demonstrating that members of the ethnic group in question have less opportunity than do other residents in the district to participate in the political processes and to elect legislators of their choice? Though not expressed in these terms, this is the rule Judge Dawkins applied in evaluating the design and impact of this plan.

## II.

I would be quick to agree that the en banc majority is correct when it states that dilution of voting strength is a question of fact. The difference between us arises because of my view that the record establishes the decision of the trial court in this case was not clearly erroneous. For example, Judge Coleman points out with emphasis in his dissent that the record in this case fails to reflect the number of *eligible* black citizens who have chosen not to register. How the majority opinion can conclude on such a record that the plaintiffs have demonstrated that past impediments to black voting still persist in this parish and that the persistence of such impediments is manifested in the disparity between black population and black voter registration is an enigma to me.[1] Until eligibility—based on age, residence, and freedom from other disqualifications established under federal law—is compared to nonregistration, this appears to be nothing more than a tenuous assumption. However, it is an assumption which is essential to the en banc court's fact reversal of the trial court as clearly erroneous.

The proof adduced in the District Court concerning the operation of the at-large election plan which governed the 1970 elections in this parish disclosed that a black candidate in the primary election for the Police Jury was defeated by only 9 votes. Another black candidate qualified for the second primary in which he ran third, 12 votes behind the second place white candidate. A third black candidate won in his contest against the incumbent president of the Police Jury, polling more votes than any candidate, not just for this post but in the entire election.

In the 1972 election which was held for only three of the nine school board posts, two blacks and one white candidate were elected. If the focus is upon "the design and impact" of at-large elections "in the light of past and present reality, political and otherwise," it is manifest that here there was no dilution of the black vote. But the majority sets its blinders so that it cannot see the present political reality because the election results were not before the District Court when it rendered its judgment.

While I unqualifiedly endorse the view that we cannot take cognizance of issues not raised or evidence that could have been but was not introduced in the court below, we are confronted with neither of these factors here. The 1972 election was held subsequent to the District Court's judgment of August 2, 1971. The result of the election is *not disputed* and was proffered to us on appeal. While the appellate process is going on, we can no more halt the political and electoral processes than we can stop the clock. We should not, however, turn either of them back when they are running properly. I see nothing novel or prejudicial about the consideration of current relevant *undisputed* matters brought to our attention on an appeal from an injunction decree. Indeed, our failure to do so is to shut our eyes to present political reality in East Carroll Parish and to do violence to the basic legal principle that injunction orders operate *in futuro.*

Finally, I am unable to agree with the majority that the 1972 election results should not be considered because of the purely speculative possibilities that the election of a black might serve the selfish political purposes of a white candidate, or that it would be better for a white to lose an election than to lose a law suit.

## III.

White v. Regester charts a clear course for adjudicating attacks on plans

---

1. For example, the 1970 census reflects that 49.6% of the black population of East Carroll Parish is under 18 years of age as compared to only 38.5% of the white population.

involving multimember districts—which in logic of analysis are merely one form of at-large voting, differing only in the extent of the geographic area involved. I cannot help but conclude that part III of the en banc majority opinion is diametrically at variance with the simple direct rule laid down by the Supreme Court in that case. By today's decision this court creates a rule which would limit the use of multimember districts to those instances where proof can be adduced which demonstrates that a *"greater* opportunity for participation" in the political process would be afforded to whichever race may be in the minority than would be possible in single member districts, or for a showing that the use of at-large election districts *"enhances* the opportunity" for minority participation in the political process. Without regard to the fact that such proof might be well-nigh to impossible to make, the law's announced preference for single member districts in populous areas does not mean that multimember districts must overcome some stigma to survive. To require that any particular plan be demonstrated to operate so as to afford an advantage to any minority ethnic group at the polling place is not an exercise of color-blind color consciousness but a legal mandate for reverse discrimination. It is not merely a rule out of keeping with the latest law of the Supreme Court, but is a mistake of major dimensions that will place the courts squarely in the center of the "political thicket."

The trier of fact in this case did not utilize an erroneous legal principle but rather applied considerations well within the rule just announced in White v. Regester. The record demonstrates ample evidence to indicate that the findings of fact made by the District Court were not clearly erroneous. For these reasons I would affirm the District Court. Most certainly I would refrain from creating any new rule regarding the use of multimember districts which runs counter to the most recent pronouncement of the Supreme Court. Thus, I dissent.