ROSENN, Circuit Judge,
dissenting.
When last this case was before our court, Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103 (3d Cir.1993) [Jenkins I ], we stated that “it would be a highly unusual case in which a plaintiff successfully proved the existence of the three Gingles factors and still failed to establish a violation [of § 2 of the Voting Rights Act].” Id. at 1116 n.6; see also id. at 1135. Since that time, several other Courts of Appeals have adopted our view.[1] Yet today the majority retreats from the compelling mandate of Jenkins I, finding a “highly unusual” situation in the ordinary and ambiguous details of the case as currently presented. For this reason, I respectfully dissent.
The majority correctly states that the Gin-gles factors are merely preconditions to a successful § 2 challenge, and that courts must look beyond these factors to the totality of the circumstances. The majority is also correct in stating that the totality of the circumstances analysis focuses on the Senate Report factors, and that the two most important factors are “the extent to which voting in the elections of the state or political subdivision is racially polarized” and“the extent to which members of the minority group have been elected to public office in the jurisdiction.” But the majority’s analysis hinges on its view that minority candidates have enjoyed “undeniably substantial success” in Red Clay elections. I see the elections through a different lens. The majority’s weighing of the Senate Report factors is imbalanced, and its affirmance of the district court decision is unwarranted.
In focusing on the details of this case, the majority has apparently overlooked the broad sweep of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and its 1982 amendments. The Act is widely considered to be the most successful piece of civil rights legislation ever enacted by Congress. See, e.g., Alexander Athan Yanos, Note, Reconciling the Right to Vote With the Voting Rights Act, 92 Colum. L.Rev. 1810, 1835 (1992). President Lyndon Johnson recognized the critical importance of the vote to minorities when he responded to the Civil Rights Act of 1964 by stating, “Yes, yes, ... I want all of those other things — buses, restaurants, all of that — but the right to vote with no ifs, ands, or buts, that’s the key.” Merle Miller, Lyndon, An Oral Biography 371 (1980).
The 1982 amendments to the Voting Rights Act acknowledged that while outright deprivation of the right to vote was more or less a thing of the past, minority vote dilution was still a tenacious problem. See, e.g., Armand Derfner, Vote Dilution cmd the Voting Rights Act Amendments of 1982, in Minority Vote Dilution 145, 145(Chandler Davidson ed., 1984). When it enacted the amendments, Congress was aware that at-large elections were seen as the principal impediment to minority representation. See, e.g., Timothy G. O’Rourke, The 1982 Amendments and the Voting Rights Paradox, in Controversies in Minority Voting 85, 110 (Bernard Grofman & Chandler Davidson eds., 1992).
*701 The purpose of Section 2 is to prohibit electoral arrangements which “dilute” (i.e., diminish) the voting power of racial minority groups. For example, at-large electoral systems (which allow every voter to vote for as many candidates as there are legislative seats to be filled in an entire jurisdiction) often violate Section 2 by allowing a cohesive racial majority to elect every single legislator, thereby leaving racial minorities unrepresented.
Michael E. Lewyn, When Is Cumulative Voting Preferable to Single-Member District-ing?, 25 N.M. L.Rev. 197, 197 (1995)(footnotes omitted).
It is against the broad mandate from Congress, that we eliminate minority vote dilution resulting from at-large electoral systems, that we must evaluate the case now before us. Plaintiffs had asked the district court to order Red Clay to adopt a system of single-member districts, the traditional remedy in cases of this sort, see, e.g., Lewyn, supra, at 197, and one which would virtually guarantee that minorities are represented on the Red Clay school board. The majority has instead, by affirming the district court decision, placed its imprimatur on a system which only by a series of flukes and anomalies has permitted any minority representation at all. This cannot be the desire of Congress, and it most certainly is not that of the Supreme Court. See Thornburg v. Gingles, 478 U.S. 30, 76, 106 S.Ct. 2752, 2780, 92 L.Ed.2d 25 (1986) (“Where multimember dis-tricting generally works to dilute the minority vote, it cannot be defended on the ground that it sporadically and serendipitously benefits minority voters.”).
When we examine the “undeniably substantial success of minority candidates” upon which the majority relies, we see that it is neither undeniable nor substantial. The majority itself acknowledges that Harlan Roberts’ 1981 plurality victory was a never-repeated situation which should be discounted. This echoes our view in Jenkins I in 1993:
Since no candidate, black or white, has won with a mere plurality since 1981, and only one black candidate has run in an election against more than a single opposing candidate since 1981, the court could not have concluded, on this record that the plurality scheme had the actual effect of allowing the black voters of Red Clay to elect their representatives of choice even though the white voters consistently voted against the minority-preferred candidates in numbers sufficient to prevent those candidates from winning a majority of the overall vote.
Jenkins I, 4 F.3d at 1123.
Caroleee Scotton, who was slated with a white, suburban candidate, beat another black candidate in an election in which no white candidate chose to run. The election took place in 1990, the year after this lawsuit was filed. The Supreme Court has noted that it might be proper for lower courts to view with some caution the success of black candidates during the pendency of litigation. Gingles, 478 U.S. at 76, 106 S.Ct. at 2780. See also Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir.1973) (“[S]ueh success might be attributable to political support motivated by different considerations — namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds.”); Gingles v. Edmisten, 590 F.Supp. 345, 367 n.27 (E.D.N.C.1984) (“[I]n some elections the pendency of this very litigation worked a one-time advantage for black candidates in the form of unusual organized support by white leaders concerned to forestall single-member districting_”).
Ronald Greene won against a white candidate in a mid-term election with exceptionally low voter turnout. Greene was perceived as being aligned with white suburban interests, presumably because of his strong opposition to mandatory school reassignment.[1] On the morning of the election, a flyer was distributed stating that the white candidate, Fiske, had withdrawn from the race. Fiske testified that this had a major impact on the election because the timing made it impossible for him to respond that the statement was untrue.
We see that of ten black candidates to run in Red Clay in the years 1981 to 1991, only three succeeded: one (Roberts) in a never-repeated plurality win, one (Scotton) by defeating another black candidate, and one (Greene) in a little-noticed mid-term election. This hardly exemplifies substantial or consis *702 tent electoral success. On the contrary, it demonstrates legally significant white bloc voting. The dismal picture is not improved by adding into the mix the two white candidates characterized by the district court as “minority-preferred,” and upon which it relied so much in reaching its ultimate result. The majority acknowledges that Charles Ca-vanaugh was, in fact, not minority-preferred, and the district court “should have discounted this race as having no impact on minority electoral success.” Maj. op. at 695. As to the other white candidate, Patricia Reinbold, of the two blacks identified by her as important in her campaign, only one testified before the district court. He had this to say in response to a query as to why he supported Reinbold: “I guess I couldn’t stand Schneck, who was running against her.” This is not the sort of “minority sponsorship” we envisioned when, in Jenkins I, we gave explicit instructions for determining whether a white candidate is “truly the minority community’s representative of choice.” Jenkins I at 1126.
Our decision today guarantees that minority voting rights in Red Clay will continue to depend upon happenstance. This is not what Lyndon Johnson envisioned when he instructed his attorney general to write the “toughest voting rights act that you can devise.” Howell Raines, My Soul Is Rested 337 (1977). It is not what Congress envisioned when it gave the president that law, and then made it even more effective with the 1982 amendments. And it is not what this court envisioned when in Jenkins I we emphasized repeatedly the rarity of a case where “an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act.” Jenkins I at 1135.
I believe that the plaintiffs’ proof of the three • crucial Gingles factors and other elements that show impeded access by black citizens to full participation in the Red Clay School District more than meet the tests necessary to establish a violation of Section 2 under the totality of the circumstances. In fight of the prolonged history of this case and its remand in 1993, remand for further findings would only aggravate an obviously unsatisfactory situation. Accordingly, I would reverse the district court’s judgment for the defendants and remand the case to it to fashion forthwith an appropriate remedy.

. See, e.g., Clark v. , Calhoun County, 88 F.3d 1393, 1396 (5th Cir.1996); Uno v. City of Holyoke, 72 F.3d 973, 983 (1st Cir.1995); NAACP v. City of Niagara Falls, 65 F.3d 1002, 1020 n. 21 (2d Cir.1995); Nipper v. Smith, 39 F.3d 1494, 1514 (11th Cir.1994), cert. denied, 514 U.S. 1083, 115 S.Ct.1795, 131 L.Ed.2d 723 (1995).