**Henry J. KIRKSEY et al., Plaintiffs,**

v.

**CITY OF JACKSON, MISSISSIPPI et al., Defendants.**

Civ. A. No. J77–0075(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

Jan. 21, 1981.

Frank R. Parker, Michael A. Middleton, Thomas J. Ginger, Jackson, Miss., for plaintiffs.

Joseph P. Wise, Thomas G. Lilly, John E. Stone, City Atty., Jackson, Miss., for defendants.

## POST–REMAND SUPPLEMENTAL MEMORANDUM OPINION

WALTER L. NIXON, Jr., District Judge.

### I.

### INTRODUCTION—BACKGROUND

This class action was filed by Henry J. Kirksey and sixteen other black citizens and registered voters of Jackson, Mississippi[1] on March 10, 1977 after the defeat of a citywide referendum held on February 22, 1977 on the issue of changing Jackson's city government from the present three-member commission form, consisting of the mayor and two commissioners, all elected at large in citywide voting to four-year terms of office, to a mayor-council form, under which the council members would have been elected from single-member districts or wards. The plaintiffs contend that the present at-large system for electing the mayor and two city commissioners abridges the rights of the city's black citizens secured by the Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1971, 1973 and 1983. Jurisdiction is premised on 28 U.S.C. §§ 1331, 1343 and 2201, and 42 U.S.C. §§ 1971(d) and 1973j(f).

Named as defendants are the city, its mayor and two commissioners who were sued individually and in their official capacities, the Jackson Municipal Democratic Executive Committee and its chairman, and the Jackson Municipal Election Commission and its members. The Jackson Municipal Republican Executive Committee and its chairman were dismissed as defendants by Order of this Court dated March 28, 1977.

On March 21, 1977, the plaintiffs filed a Motion for Preliminary Injunction, seeking to halt the municipal Democratic and Re-

---

1. This action was certified as a Rule 23(b)(2) Class Action on behalf of "all black citizens and black registered voters of the City of Jackson, Mississippi." Order of June 24, 1977.

publican primary elections scheduled for May 10, 1977 and the municipal general election scheduled for June 7, 1977. On March 31, 1977, after an extensive hearing on the motion, this Court, in a bench opinion, denied plaintiffs' Motion for Preliminary Injunction. This denial was affirmed on appeal to the United States Court of Appeals for the Fifth Circuit on April 21, 1977. The Court of Appeals directed this Court "to expedite hearing on the merits at the earliest feasible time." *Kirksey v. City of Jackson*, 552 F.2d 156 (5th Cir. 1977). Subsequently, this case was tried on its merits on July 6–8, 1977 during which extensive evidence was adduced, and the Court found for the defendants after applying the principles of both *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (*en banc*), aff'd. *per curiam on other grounds, sub nom. East Carrol Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), which at that time was the polestar of the Fifth Circuit on the question of voter dilution and methods of proof thereof, and *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). This Court rendered its Memorandum Opinion in this case on August 30, 1978, making specific Findings of Fact and reaching specific Conclusions of Law as dictated by the Fifth Circuit in *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978) and its companion cases. *See Kirksey v. City of Jackson, Miss.*, 461 F.Supp. 1282 (S.D.Miss. 1978). In its "Conclusion" this Court found that

> Under the facts of this case, the plaintiffs have failed to prove that the claimed dilution was the result of any invidious discriminatory purpose or intent. In the aggregate the *Zimmer* criteria do not point to intentional discrimination as a motivating factor in either the enactment or maintenance of the present form of municipal government and the present electoral process in Jackson, Mississippi. *Id.* at 1314.

This Court's decision was appealed to the Fifth Circuit, and oral argument was scheduled by the court for May 7, 1980. Prior to that time, on April 22, 1980, the United

States Supreme Court rendered its decision in *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), in which the Supreme Court reversed the lower courts and held that the plaintiffs' satisfaction of the criteria set out in *Zimmer v. McKeithen, supra,* standing alone, was insufficient to establish a discriminatory purpose or intent. The Supreme Court relied primarily upon its earlier decisions in *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); and *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Oral argument of this case was made before a panel of the Fifth Circuit as scheduled on May 7, 1980, and despite the fact that both the appellants and appellees urged the court of appeals to decide this case on the record before it, the Fifth Circuit, consistent with the usual practice of appellant courts in a situation of this type, declined to do so, and on August 13, 1980 vacated this Court's 1978 Judgment and remanded this case for a supplemental evidentiary hearing and reconsideration in light of the Supreme Court's intervening decision in *City of Mobile, Ala. v. Bolden, supra. See Kirksey v. City of Jackson, Mississippi,* 625 F.2d 21 (5th Cir. 1980). In its *per curiam* opinion remanding this case, the court of appeals stated that although it was unable to decide the appeal at that time, it recognized the importance of this case and its urgency in terms of the impending 1981 City of Jackson municipal elections and went on to state:

> Therefore we make clear that on the remand the parties shall be free, subject to the initial control of the District Judge, to offer further evidence, to be considered in conjunction with the present record which need not be repeated. Furthermore, we direct that reconsideration and decision of this case be expedited by the Trial Court. . . . *Id.* at 22.

## II.

### POST–REMAND PROCEEDINGS

A. Pretrial Conference and Proceedings.

On August 20, 1980, six days after receipt of the Fifth Circuit Opinion remanding this case, this Court called a conference of counsel for the purpose of discussing the status of the case and establishing ground rules for the post-remand preparation and trial of this case, in which the parties would be given the opportunity to offer further evidence, to be considered in conjunction with the record of the original trial, in accordance with the opinion of the Fifth Circuit. At that conference counsel for both sides advised the Court that the supplemental hearing would probably be concluded in two days, and that the presentation of further expert testimony was not anticipated. During the conference the plaintiffs were directed to provide the defendants with a statement of issues to be presented and decided at the hearing as well as a list of their witnesses, by September 5, 1980. The defendants were instructed to submit the same information to the plaintiffs by September 15, 1980. At the conclusion of the conference the parties were advised by the Court that a trial date would be set in late October or early November, 1980, which would be announced in the immediate future by the Court after it had an opportunity to check its schedule and make some necessary changes. The Court also instructed counsel that application for leave to conduct discovery should be made directly to the Court.

By letter of September 9, 1980 plaintiffs' counsel requested an extension of time until September 19, 1980 to submit the plaintiffs'

"Proposed Pretrial Order," and the requested extension was granted without objection of the defendants. Subsequently, on September 12, 1980 the parties were notified by the Court that the post-remand or supplemental trial would be conducted on October 27, 1980.

On September 20, 1980 the defendants received the plaintiffs' "Proposed Pretrial Order" which incorporated a list of witnesses, at least four of whom were experts.[2] Defendants' counsel obtained an agreed extension of time until October 9, 1980 to submit their statement of issues and list of witnesses, and on October 1, 1980 sought leave to submit a limited set of interrogatories and depose the plaintiffs' witnesses after receipt of expedited responses. This Court issued an appropriate order on October 2, 1980 and the defendants filed their interrogatories on that date, directing the plaintiffs to respond thereto by October 13, 1980.

By letter of October 3, 1980, a request to conduct some discovery was made by the plaintiffs, which was granted by Order dated October 9, 1980 which in addition required the defendants to respond to the plaintiffs' interrogatories by October 17, 1980. Also, on October 9, 1980 the defendants timely submitted their statement of issues and list of witnesses to the Court and opposing counsel.[3]

The plaintiffs' responses to the defendants' interrogatories which were due October 13, 1980 were hand delivered to defendants' counsel on the evening of October 14, 1980 and contained a second list of eleven witnesses, at least four of whom were experts.[4] John L. Grimm, M.B.A., was listed

---

**2.** The following witnesses were listed by the plaintiffs at this time: Dr. James W. Loewen, Dr. Gordon G. Henderson, Dr. Charles Sallis, Kane Ditto, Fred L. Banks, Jr., Mrs. Elaine Crystal, Russell C. Davis, Gery Cummings, Earl Fortenberry, Fran Leber, Dr. Jerry Himelstein, and Henry J. Kirksey. Although not so designated in this document, Dr. Loewen, Dr. Henderson, Dr. Sallis and Dr. Himelstein were to testify as expert witnesses.

**3.** Six witnesses were listed by the defendants: Mrs. Evelyn Ballard, John E. Stone, Kathryn

Hester, Michelle Hudson, Albert Dillon and Dr. Larry Powell. Dr. Powell was the only expert witness listed by the defendants.

**4.** Although Drs. Loewen, Henderson and Sallis were listed as expert witnesses, Dr. Himelstein, whose name appeared on the first list, was deleted from the second and John L. Grimm, M.B.A., was listed as an expert in these responses. In addition, the following lay witnesses were listed in the responses: Henry J. Kirksey, Fred L. Banks, Jr., Kane Ditto, Ronna Pritchard, Gery A. Cummings, Earl Fortenberry

for the first time as a witness (expert), and it was stated that he would testify as to "factors influencing 1977 voters to retain commission form of government." It was further stated that Mr. Grimm at that time had not completed collection and analysis of the data upon which his opinion would be based. In response to the defendants' interrogatory concerning materials relied upon by Grimm in preparing his testimony and formulating opinions, five treatises were listed, and it was stated that he would also rely upon "questionnaires and computer printouts not yet in existence." Plaintiffs' Answers to Defendants' Interrogatories at pages 5 and 7.

On October 17, 1980, the deposition of Gery A. Cummings was taken by the plaintiffs in New Jersey. Also on that date, the defendants filed timely responses and objections to plaintiffs' interrogatories. These responses were supplemented on October 20, 1980, in which the same original six witnesses were listed by the defendants.

The deposition of Robert Wise was also taken by the plaintiffs on October 21 and 22, 1980, and during the taking of that deposition counsel for the plaintiffs hand delivered a "Statement of Issues and List of Witnesses" to the offices of counsel for the defendants. This third list of witnesses contained twelve names, at least six of whom were experts, and for the first time the plaintiffs listed Dr. Rommel Benjamin and Dr. Neil McMillen as expert witnesses, with no indication as to the nature and substance of their testimony or the issues concerning which they would testify.

On October 23, 1980 plaintiffs supplemented their answers to interrogatories to indicate for the first time that plaintiff, Henry J. Kirksey, would testify as an expert in "cartography" and "participation in political process." In the exchange of documents which took place on October 23, 1980, just three full days before the trial scheduled for the morning of October 27, 1980, the defendants for the first time received a copy of a report prepared by John L.

Grimm, one of the expert witnesses listed by plaintiffs. On that same date, defendants' counsel advised the Court and opposing counsel of their intention to object to the testimony of Dr. Benjamin, Dr. McMillen and Mr. Grimm. The plaintiffs' attorneys responded to these objections on that same date.

On October 24, 1980 the deposition of Dr. Larry Powell, the defendants' only expert witness, was taken by the plaintiffs, and on Saturday, October 25, 1980 counsel for the defendants received the plaintiffs' Second Supplemental Answers to defendants' Interrogatories, which contained further information relative to the testimony of Drs. McMillen and Benjamin.

This Court found it necessary to relate the above sequence of events in view of the fact that during the supplemental hearing we sustained the defendants' objection to the testimony of Dr. McMillen and Mr. Grimm, precluding their testimony for the reasons stated in our bench opinion, which is briefly restated *infra*.

B. Exclusion of the Testimony of Dr. Benjamin and Mr. Grimm During this Post-Remand Trial.

The supplemental trial was held on October 27–30, 1980 during which this Court again heard extensive testimony and received substantial documentary evidence. The plaintiffs called eight witnesses, four of whom were experts, and offered the deposition of Gery A. Cummings which was admitted into evidence. All objections and motions to strike made by the defendants thereto have now been overruled by the Court. The defendants called three witnesses, which included one expert.

At the outset of this supplemental trial the Court heard arguments on the defendants' Motion to Exclude the Testimony of Dr. Rommel Benjamin, Dr. Neil McMillen and John L. Grimm, M.B.A. This motion was premised on the plaintiffs' failure to timely provide information concerning

and Robert Wise. Mrs. Elaine Crystal, Russell C. Davis and Fran Leber were deleted from the second list, and Mrs. Ronna Pritchard and Robert Wise were added.

these witnesses in interrogatory responses, which the defendants contended constituted a violation of the ground rules laid down by this Court as well as the Federal Rules of Civil Procedure. Based upon the sequence of events previously related, this Court in its bench opinion granted the defendants' Motion to Exclude the Testimony of Dr. McMillen and Mr. Grimm for reasons stated therein, but permitted Dr. Benjamin to testify inasmuch as the plaintiffs represented to the Court that his testimony was being substituted for that of Dr. Jerry Himelstein. Dr. Himelstein had been listed as a witness in the plaintiffs' original witness list. Plaintiffs represented that Dr. Benjamin's testimony would be similar or identical to that of Dr. Himelstein, who had unexpectedly become unavailable to the plaintiffs as a witness.

 We now reaffirm our previous decision to exclude the testimony of the witnesses McMillen and Grimm for the reasons stated in our bench opinion, after which we permitted the plaintiffs to make appropriate offers of proof of what these witnesses would testify to and what evidence they would sponsor if permitted to testify. In its per curiam opinion vacating and remanding this case to this Court, the court of appeals authorized a supplemental hearing on the merits, which was conducted herein and explicitly stated that the presentation of additional evidence was "*subject to the initial control of the District Judge. . . .*" (Emphasis added). *Kirksey v. City of Jackson, Mississippi*, 625 F.2d 21, 22 (5th Cir. 1980). This Court set the ground rules during the conference of August 20, 1980, and, despite the plaintiffs' argument to the contrary, the Federal Rules of Civil Procedure were certainly applicable to this supplemental hearing on the merits.

As previously stated by this Court in its bench ruling on the defendants' motion to exclude the testimony of the witnesses in question, the plaintiffs' interrogatory response concerning Grimm's testimony, served on the defendants on the evening of October 14, 1980, was incomplete to say the least, and was not in compliance with the ground rules established by this Court nor the Federal Rules of Civil Procedure. Actually, a copy of his report was not furnished to the defendants until October 23, 1980, just three days prior to the date of trial. Similarly, Dr. McMillen and Dr. Benjamin were not listed as witnesses until October 21, 1980 and supplemental interrogatory responses concerning their testimony was not provided to the defendants until October 23 and 25, 1980, respectively. This Court was and is of the definite opinion that to permit Dr. McMillen and Mr. Grimm to testify would constitute prejudice to the defendants inasmuch as they were deprived of the right and ability to adequately prepare for cross-examination of these witnesses or the right to attempt to obtain and present rebuttal evidence; to permit them to testify would be to countenance a "trial by ambush." While the Court recognizes its duty to permit the proffer of all relevant evidence by parties to a trial, we are of the opinion and find that the plaintiffs failed to exercise reasonable diligence to give defendants adequate information concerning these witnesses, in compliance with the ground rules and the Federal Rules of Civil Procedure, and thus it would be unfair to the defendants to have permitted these witnesses to testify in view of the foregoing actions and inactions of the plaintiffs' attorneys.[5] *See Shelak v. White Motor Compa-*

---

**5.** In any event, the testimony of Dr. Benjamin would merely have been cumulative to the testimony offered by the plaintiffs. The testimony of Grimm concerning any responses to inquiries made by him of some of the electorate in 1980 as to why they voted against the proposed change in the referendum would be given very little if any weight by this Court in view of the fact that the poll was taken over three years subsequent to the referendum election. Testimony as to what motivated some of the voters, even if a proper subject of inquiry, which this Court seriously doubts, would not be reason to justify a finding of intentional or purposeful invidious discrimination by the electorate who voted against the proposed change in the form of city government, for the reasons stated in the next succeeding topic herein. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 fn.'s 20 and 21, 97 S.Ct. 555, 566 fn.'s 20 & 21, 50 L.Ed.2d 450 (1977). The result of the 1977

*ny,* 581 F.2d 1155, 1160 (5th Cir. 1978); *Davis v. Marithon Oil Company,* 528 F.2d 395, 403–404 (6th Cir. 1975).

Mindful of the teachings of *City of Mobile, Ala. v. Bolden, supra,* decided by the Supreme Court in 1980, the plaintiffs in this supplemental trial have limited their presentation of evidence and their attack on the constitutionality of the mayor-commission form of government in the City of Jackson to the enactment and adoption of that form of government in Jackson in the early 1900's as well as the maintenance thereof since that time, principally as a result of the referendum of 1977. Succinctly, they contend and have offered evidence in an attempt to prove racially discriminatory intent in the enactment and adoption of the challenged form of government as well as its maintenance for the alleged purpose of devaluing the votes of minorities. The defendants of course have challenged these contentions and offered contradictory evidence, and it is this Court's duty to now discuss and resolve these issues pursuant to the teachings of *City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

The plaintiffs attacked the establishment of the mayor-commission form of government in the City of Jackson on two fronts, namely, the enactment by the Mississippi Legislature of the legislation permitting the adoption of this challenged form of government by the City of Jackson in 1908 and 1912 and its actual adoption by a referendum election held in the city in 1912, after its rejection in the referendum of 1908. Of course, the present challenged form of government and the election of the mayor and city commissioners in at-large voting would never have been established in the

election would have been the same, even accepting Grimm's testimony and sponsored evidence, which affirmative defense this Court finds was proved by the defendants by a preponderance of the evidence.

City of Jackson despite the enabling legislation passed by the Mississippi Legislature in 1908 and 1912, had not the electorate of the City of Jackson adopted it by majority vote in the 1912 referendum. In addition to their attack on the constitutionality and validity of the enactment by the Mississippi Legislature of the necessary legislation permitting the voters of the City of Jackson to determine whether they would adopt the mayor-commission form of government being challenged herein, the plaintiffs challenge the two referenda of 1912 and 1977 as evidencing a racially discriminatory intent or purpose of the majority of the voting electorate to violate the rights of the black citizens of the City of Jackson guaranteed by the Fourteenth and Fifteenth Amendments to the United States Constitution as well as Section 2 of the Voting Rights Act of 1965 (79 Stat. 437, 42 U.S.C. § 1973).[6]

It is to be noted that on the maintenance issue, the only action of which the plaintiffs complain is the vote of the majority of the voting electorate to retain the challenged form of government in the 1977 referendum. It is necessary for this Court to initially address the propriety of this two-fold attack by the plaintiffs with reference to the intent of the majority of the electorate who voted in the 1912 and 1977 referenda, i. e., whether the motivation of these voters is a proper subject of judicial inquiry in determining the constitutional challenge made by the plaintiffs.

### III.

### PROPRIETY OF JUDICIAL INQUIRY INTO MOTIVATION OF THE ELECTORATE

■ The Supreme Court has recognized that legislative or administrative history may be highly relevant in determining whether racially discriminatory intent existed in connection with official actions tak-

**6.** The complaint also contained claims based on 42 U.S.C. § 1983, which have not been pursued in this Court.

en by those bodies, especially where there are contemporary statements by members of the decision-making body in minutes of its meetings or reports. Furthermore, in some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although such testimony frequently will be barred by privilege. *See Village of Arlington Heights v. Metropolitan Housing Development Corp., supra* at 268, 97 S.Ct. at 565, where the Supreme Court recognized that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government and that placing a decision maker on the stand is therefore usually to be avoided. *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra* at 268, fn. 18, 97 S.Ct. at 565 fn. 18. In the instant case, however, the plaintiffs have attempted to prove that a discriminatory purpose was the motivating factor in the decision of the electorate who voted to adopt the commission form of government in 1912 and to retain it in the 1977 referendum. This Court is of the opinion that an inquiry into motives of legislators or other administrative or legislative bodies in search of a discriminatory purpose, even if proper, is not justification for a similar inquiry into the motives of a voting electorate in referenda.

Certainly, if the plaintiffs' position in this case is such that it assumes that the referenda determining Jackson's form of government involved the delegation of legislative power, it is without merit because such position was rejected by the Supreme Court in *Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1966), where it was contended that a city's zoning referendum constituted such a delegation. In *Eastlake* the Court held that a referendum cannot be characterized as a delegation of power because under our constitutional assumptions, all power derives from the people who can delegate it to representative instrumentalities which they create, and that a referendum is a means for direct political participation, allowing the people the final decision, amounting to a veto power over enactment of representative bodies, which practice is designed to give the citizens a voice on questions of public policy. *Id.* at 672–73, 96 S.Ct. at 2361–2362.

In *Anderson v. Martin*, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964) the Supreme Court held that a state requirement that nomination papers and ballots designate the race of candidates for public office operated as an unconstitutional discrimination against Negro candidates where the requirement was enacted when there were unfavorable private attitudes and pressures against Negroes. However, since that private repressive effect was brought to bear only after the exercise of governmental power, the Court significantly stated:

> At the outset it is well that we point out what this case does not involve. It has nothing whatever to do with the right of the citizen to cast his vote for whomever he chooses and for whatever reason he pleases or to receive all information concerning a candidate which is necessary to a proper exercise of his franchise. *Id.* at 402, 84 S.Ct. at 455.

An inquiry of this type into the motives of voters may very well constitute an unwarranted and unconstitutional undermining of one of the most fundamental rights of the citizens under our constitutional form of government, that is, to exercise their franchise, as was recognized by the Ninth Circuit in *Southern Alameda Spanish Speaking Organization v. City of Union City, Col.*, 424 F.2d 291, 295 (9th Cir. 1970). In *Union City* the Court observed:

> If the voters' purpose is to be found here, then, it would seem to require far more than a simple application of objective standards. If the true motive is to be ascertained not through speculation but through a probing of the private attitudes of the voters, the inquiry would entail an intolerable invasion of the privacy that must protect an exercise of the franchise.

Also *see Ranjel v. City of Lansing*, 417 F.2d 321, 324 (6th Cir. 1969), where the court of appeals stated that "if the electors had a legal right to a referendum, their motive in exercising that right would be immaterial."

In *American Communications Association v. Douds*, 339 U.S. 382, 395–96, 70 S.Ct. 674, 682, 94 L.Ed. 925 (1950), the Supreme Court stated that "under the First Amendment, the public has a right to every man's views and every man the right to speak them. . . . Speech may be fought with speech, falsehoods and fallacies must be exposed, not suppressed. . . ." *See also Rudisill v. Flynn*, 470 F.Supp. 1269 (N.D.Ill.1979); *Good v. Roy*, 459 F.Supp. 403 (D.Kan.1978).

Private conduct on the part of voters is to be distinguished from acts of individuals engaged in state action when performing a public function. The latter has been characterized as public action, *Tiryak v. Jordan*, 472 F.Supp. 822, 824 (E.D.Pa.1979), whereas the former is purely a private exercise of the right to vote. There is no claim by the plaintiffs nor could they properly contend that those voters who voted to establish and maintain the mayor-commission form of government challenged herein in the 1912 and 1977 referenda were, by virtue of voting, performing a public function, as distinguished from expressing their private, constitutional, political views in determining the form of government under which they wished to live as citizens of Jackson, Mississippi. In summary, this Court is of the opinion and finds that the motivation of the majority of the electorate who voted in the 1912 and 1977 referenda in question is not a proper inquiry.

Nevertheless, assuming that this determination is erroneous and that the Court may inquire into the motivation of the electorate in these referenda, we are nevertheless of the opinion that the plaintiffs have failed to prove racially discriminatory intent or purpose in either the enactment or establishment or maintenance of the challenged form of government in the City of Jackson for the following reasons.

## IV.

## MOTIVATION OF THE ELECTORATE IN THE 1912 AND 1977 REFERENDA

The plaintiffs contend, *inter alia*, that race was a significant motivating factor in the enactment of the enabling legislation of 1912 by the Mississippi Legislature permitting the citizens of the City of Jackson to hold a referendum to decide whether the governing body of that City should be changed from a mayor-alderman to a mayor-commission form of government. Furthermore, they contend that the majority of the electorate who voted in favor of the change in 1912 was racially motivated in casting their ballots resulting in the change to the present form of government which provides for at-large elections of the mayor and two commissioners.

■ In this Court's original opinion we found that the plaintiffs had failed to meet their burden of proving these contentions by a preponderance of the evidence. *See Kirksey v. City of Jackson*, 461 F.Supp. 1282, 1313 (S.D.Miss.1978). After this post remand hearing, applying the criteria of *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), we are even more convinced that invidious racial discrimination was not a motivating factor in either the enactment of the legislation or the adoption of the at-large voting scheme by the electorate in 1912.

It is undisputed that in the late 1800's and early 1900's in Mississippi, and in Jackson in particular, there was a concerted effort to disenfranchise black voters who had gained control of government following the war between the states as a result of the Mississippi Constitution of 1868 (The Black and Tan Convention), following which blacks were elected to state and local office during the Post-Civil War. Indeed, the 1890 Constitutional Convention in Mississippi was called for the purpose of ex-

cluding blacks from voting. This purpose was accomplished by the adoption of the following prerequisites to voter registration: literacy and constitutional interpretation tests, poll tax, residency requirements, and the listing of disenfranchising crimes. Also, the institution of "white primaries" was enacted in 1902. The foregoing "requirements" were extremely effective, and all of the witnesses who testified in this case, including Dr. William Charles Sallis, Professor of History at Millsaps College, the only witness who testified for the plaintiffs at the post-remand hearing herein on the questions of "enactment" and "adoption" in 1912, agreed that at the time of the enactment of the enabling legislation in 1912 and the holding of the 1912 referendum pursuant thereto, black disenfranchisement was virtually complete in Jackson.[7]

At the time of the adoption of the commission form of government in Jackson, the City was governed by a mayor and a board of eight aldermen. The mayor and two aldermen were elected at large, and the six remaining aldermen were each elected from one of six wards. At the time of the enactment and adoption in 1912, the mayor and all eight aldermen were Caucasians. The last Negro alderman in the City of Jackson was elected in 1899, some thirteen years prior to the adoption of the commission form of government.

In 1908, the legislature had enacted legislation to permit Jackson voters to hold a referendum on whether to make a change to the very form of government being attacked herein, and although practically all of the voters of the City of Jackson were white, this referendum failed by a vote of 447 to 399. At the time of the 1908 referendum, Jackson was governed by an all white governing body, just as it was in 1912 when the referendum subsequently passed. During this time Jackson's eight aldermen were elected from four wards, two from each of three wards, one from one ward and one at-large. In reporting on the defeat of the referendum in 1908, the Jackson Daily News reported the reasons for the failure to

be lack of understanding of the proposition by the electorate as well as voter apathy. The paper also reported that the City of Laurel, Mississippi had previously held a referendum on changing to the at-large mayor-commission form of government and had likewise rejected the change.

Significantly, James K. Vardaman, who in the opinion of Dr. Sallis, was the foremost racist of his time, supported the proposed change of 1908, which was defeated by the virtually all white electorate of the city. It is significant that plaintiffs' witnesses could point to no racial statement by Vardaman as a basis for his support of the proposed change which was rejected in 1908.

The adoption of the mayor-commission form of government by the voters of Jackson in the 1912 referendum was part of the progressive reform movement throughout the United States at a time when countless other municipalities and other local governmental units throughout the United States adopted the same basic electoral system of at-large voting to elect their governing bodies. *See City of Mobile, Ala. v. Bolden, supra* at 1496, and Justice Stevens' concurring opinion. This movement originated in Galveston, Texas and was motivated solely by the twofold desire to eliminate corruption in government which was widely felt resulted from the election of governing officials from small wards or districts and also because of the lack of efficiency in municipal and local governments. This same desire and motivation is reflected in the Jackson newspaper articles admitted in evidence. (General Exhibit D–48).

More significantly, plaintiffs' witness, Dr. Sallis, admitted that he could point to no evidence of any statement of any supporter or proponent of the commission form of government with its at-large voting corollary that in any way reflects race as a motive for the adoption of the present form of government in 1912. He further admitted on cross-examination that he had not made a detailed study of Jackson's 1912

7. *See also* the orig. tr., pp. 29–31 (Dr. Foster); Ex. P–36 at 65, 162–65 (Dr. Lowen).

referendum or the factual circumstances surrounding it and candidly admitted that he could not say what was in the minds of the voters in that referendum. In a textbook co-authored by Drs. Sallis and Lowen entitled "MISSISSIPPI: CONFLICT AND CHANGE" (1974), which discussed various devices initiated to disenfranchise blacks, the adoption of at-large voting in municipalities or other local governments was not listed or alluded to as one of those disenfranchising devices. Although Dr. Sallis on cross-examination attempted to explain or justify its omission on the basis that one must be selective in writing a textbook of this kind, this Court finds it very significant and supportive of our conclusion that the adoption of at-large voting was not motivated by racial considerations.

Following the passage of the 1912 referendum, the all-white city government of Jackson refused to certify the results of the referendum, contending that the enabling legislation which permitted the change was unconstitutional because it required a party primary election. The Mississippi Supreme Court affirmed the circuit court judgment for the State of Mississippi which brought a mandamus action against the city council to compel it to comply with state law as a result of the passage of the referendum, and it was only in this manner that the present form of government of the City of Jackson came into being.

Jackson's adoption of its present form of government in 1912 closely paralleled that of many other municipalities throughout the South and other parts of the nation and was brought about by the desire of the electorate to eliminate corruption, with no racial overtones or motivation. As previously stated, blacks had been virtually disenfranchised, and actually, at the time of the 1908 and 1912 referenda, had been completely excluded from participation in the Democratic Party primaries in Mississippi, which were tantamount to general elections. This fact, together with all of the other disenfranchising devices, had completely negated any racial motivation of the legislature in enacting the 1912 enabling legislation or the voters who voted for the

change. Thus, this Court finds that race was not a motivating factor in the enactment of the legislation permitting the referendum of 1912 or the adoption of the commission form of government with at-large voting by the electorate of Jackson in 1912. Following what the Court stated in *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), if the plaintiffs herein contend that the state legislature in 1912 is

> presumed to have intended that there would have been no Negro commissioners, simply because there was a foreseeable consequence of at-large voting, [they] applied an illegal standard. Discriminatory purpose implies more than intent as volition or intent has awareness of consequences.... It implies that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group. *Id.* at 1502, fn.17.

We therefore must address the remaining issue to be decided by this Court, namely, whether the plaintiffs have proved by a preponderance of the evidence racial discrimination in Jackson's maintenance or retention of its present form of city government.

## V.

## MAINTENANCE OR RETENTION OF JACKSON'S PRESENT FORM OF GOVERNMENT

In our original opinion, we recognized that it is not necessary for the plaintiffs to prove racially discriminatory motivation in the enactment of a challenged plan, but that it suffices if they prove by a preponderance of the evidence that the plan has been *maintained for the purpose of excluding minority input or of devaluing or diluting the votes of minorities*. *Kirksey v. City of Jackson, supra* at 1313. The Supreme Court in *Bolden* alluded to the fact that there was evidence in that case that several proposals that would have altered the form of Mobile's municipal government had been

defeated in the state legislature, including at least one that would have permitted Mobile to govern itself through a mayor and city council with members elected from individual districts within the city. The Court went on to state "whether it may be possible ultimately to prove that Mobile's present governmental and electoral system has been retained for a racially discriminatory purpose, we are in no position now to say." *City of Mobile, Ala. v. Bolden, supra* at 1504, fn. 21.

■ In contrast, the Mississippi Legislature in 1976 did enact legislation to permit the electorate of Jackson to hold a referendum to determine whether they wished to retain the present challenged form of government or adopt a mayor-council form government with the mayor to be elected from the city at large and nine councilmen to be elected from nine single-member districts or wards. Following an intensive and quite lengthy campaign by proponents and opponents of the proposed change, including the extensive use of the news media by both sides as well as news articles and editorials written with reference to the impending referendum, the election was held on February 22, 1977 and resulted in the defeat of the proposed change by a vote of 14,935 to 11,497. Immediately following this referendum the plaintiffs filed this action.

Before addressing the specific contentions and complaints of the plaintiffs relating to the 1977 referendum, it is important to note what they do not charge or challenge in connection therewith. First, they do not complain about the enabling legislation which permits any municipality in the State of Mississippi, regardless of the form of government under which it is operating, to adopt the mayor-council form of government by the procedure set forth therein. Miss.Code Ann. § 21–8–1 *et seq.* (1972) as Amended.[8] Of course if the enabling legislation had not been enacted, the defendants would have been subject to the same type allegation made in the *Bolden* case, i. e., that the legislature refused to permit the electorate to make a desired change from the mayor-commission form of government. In addition, the legislation was enacted as a result of the efforts of those who favored the proposed change, including many of the plaintiffs herein, and was openly and actively supported by them as a way to have blacks elected to municipal government in the City of Jackson.

Secondly, the plaintiffs do not contend that the holding of the referendum in and of itself was racially motivated, and as stated previously, a large number of blacks, including the plaintiffs Fred L. Banks, Jr. and Henry J. Kirksey, supported the holding of the referendum and were active in various phases of the campaign.

Thirdly, no claim whatsoever has been made or is being made, nor was any evidence ever adduced by the plaintiffs in support of any claim of fraud or irregularity in the actual conduct of the election, in the voting procedures utilized, or in the tabulation of the results. Also, there has never been any contention by the plaintiffs and there is none now, nor have they ever adduced or attempted to adduce any evidence whatsoever of any inhibitions or interference with the rights of Negroes to become candidates in any elections in the City of Jackson in recent years prior to 1977. Furthermore, no claim has been made that Negroes in any way have been inhibited or discouraged from registering and voting, not only in this referendum but in other recent elections in the City of Jackson. Plaintiffs have absolutely failed to prove

---

**8.** Section 21–8–7 sets forth the manner in which the election is to be held and permits the number of councilmen to be established by the petition or petitions presented pursuant to section 21–8–3. It provides that "the council shall consist of five, seven or nine members. In the event that there are five councilmen the municipality shall be divided into either five or four wards. In the event there are seven councilmen the municipality shall be divided into either seven or five wards. In the event that there are nine councilmen the municipality shall be divided into seven or nine wards. If the municipality is divided into fewer wards than it has councilmen, the other councilman or councilmen shall be elected from the municipality at large."

any lack of access in the electoral process either in slating, registering or voting in the City of Jackson in the last few years prior to or in the 1977 referendum.

We previously pointed out in our original opinion that anyone who seeks nomination in the Democratic or Republican primaries may do so by merely having his application certified by either the Democratic or Republican Executive Committee, which is a mere formality. *Kirksey v. City of Jackson, Miss., supra* at 1288. Although this Court has found a past history of official racial discrimination in the state of Mississippi, we further found and now reiterate that the defendants herein have met their burden of proving that enough incidents of the past have been removed and the effect of past denials of access have been dissipated to the extent that there was equality of access and effective meaningful participation of blacks in the electoral or political process in the City of Jackson in 1977 and several years prior thereto. Furthermore, the absence of lingering effects of past discrimination which preclude effective participation of blacks in the election system makes for open and equal access to the election process by blacks in Jackson. We also found that the existing systematic and rapidly increasing responsiveness of the city government to the needs and interest of black Jacksonians is a reality.[9] *Kirksey v. City of Jackson, Miss., supra* at 1313.

Plaintiffs, dissatisfied with the outcome of the 1977 referendum, attack the result by claiming that certain persons were racially motivated to vote against the proposed change of government. As previously stated, even assuming (although we have reached a contrary conclusion) that an inquiry into the voting majority's motives and intents is proper, we are nevertheless firmly convinced after weighing all of the evidence and judging the credibility of all witnesses who testified, that the plaintiffs have wholly failed to prove by a preponderance of the

evidence that the retention of the mayor-commission form of government in the City of Jackson was racially motivated. Stated differently, the plaintiffs have failed to prove any intentional and purposeful racial motivation for the retention or maintenance of Jackson's form of government in violation of either the plaintiffs' Fourteenth Amendment or Fifteenth Amendment constitutional rights or any other civil rights, pursuant to the principles enunciated by the Supreme Court in *City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which are discussed *infra.*

### A.

We first note that racially discriminatory motivation or intent is a necessary ingredient of a Fifteenth Amendment violation. *City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Wright v. Rockefellar,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). As previously stated, there did not exist in the City of Jackson in 1977 or for several years prior thereto, and there does not now exist, any hindrance, impediment or interference with the rights of black citizens to register and vote, as well as to qualify and seek office in the Democratic and Republican primaries or the general election. No individual's vote is worth less than any other's. What is really contended herein is that the political structure that exists in the City of Jackson by virtue of at-large voting treats all individuals as equals but adversely affects the political strength of a racially identifiable group. The Fifteenth Amendment does not insure the right to have Negro candidates

---

**9.** This Court's original opinion contains a full discussion of the background and history relative to this entire issue, including all of the *Zimmer v. McKeithen* criteria and this Court's detailed Findings of Fact and Conclusions and ultimate Findings of Fact with reference thereto, each and every one of which this Court readopts and reaffirms, for the reasons stated therein.

elected but prohibits only purposeful discriminatory denial or abridgement by government of the freedom to vote "on account of race, color or previous condition of servitude." This Court previously found and now readopts its finding that Negroes in Jackson register and vote without hindrance; therefore, the plurality test of *Bolden* is satisfied. Also, in applying the objective effects of the political decision, rather than the subjective motivation of the decision makers, as did Justice Stevens in his concurring opinion, this Court finds that the commission form of government in Jackson is not extraordinary and is not merely a vestige of history with no greater justification than the grotesque figure in *Gomillion*, but on the contrary the decision to adopt and maintain the commission form of government with its at-large voting requirement is a political decision that is supported by valid and articulable justifications inasmuch as its basic election system is the same as that followed by literally thousands of municipalities and other governmental units throughout the nation. The fact that these at-large systems characteristically place one or more minority groups at a significant disadvantage in the struggle for political power cannot invalidate all such systems. *See City of Mobile, Ala. v. Bolden, supra* at 1496, fn. 7.

Thus, the at-large voting system and concomitant form of government being attacked herein are generally accepted in the United States.

Dr. Gordon Henderson, a witness for the plaintiffs, admitted on cross-examination that the 1977 Municipal Year Book reflects that fifty per cent of the states in the United States have one or more cities with the commission form of government; also, less than fifty per cent of the cities in only two regions of the United States, the Northeast and West South Central, have systems of government that provide for at-large voting, whereas, over fifty per cent of the cities in the remaining regions of our country, including the Solid South, Middle Atlantic, East South Central, Border States and Mountain States have city governing officials elected by at-large voting. In ad-

dition, he admitted that quite a number of large cities in the United States still maintain the mayor-commission form of government, despite the fact that he contends that it is "inefficient and on the way out." According to the 1979 Municipal Year Book, most municipalities of over 25,000 conducted at-large elections of their city commissioners or council members in 1977. *See City of Mobile, Ala. v. Bolden, supra* at 1496, fn. 7.

Applying each of the foregoing standards of proof in determining the plaintiffs' claimed Fifteenth Amendment violation, this Court finds that plaintiffs have totally failed to sustain their burden of proving that the defendants invaded the protection of that amendment in the case *sub judice* under either of those standards.

### B.

In their proposed memorandum opinion submitted to this Court subsequent to the supplemental trial, the plaintiffs argue that even if not racially motivated, at-large voting in Jackson violates plaintiffs' rights secured by the Civil Rights Act of 1870, as amended, 42 U.S.C. § 1971, and Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. Their argument states that in enacting voting rights legislation, Congress has the power to legislate beyond the specific prohibitions of the Fourteenth and Fifteenth Amendments to protect rights secured by those Amendments, and legislatively to prohibit and enjoin practices which have a racially discriminatory effect or impact and which perpetuate the effects of past discrimination. In support of this contention they cite *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); *Fullilove v. Klutznick*, —— U.S. ——, 100 S.Ct. 2758, 2774, 65 L.Ed.2d 902 (1980); and *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). The plaintiffs contend that neither a majority of the Supreme Court in *Bolden*, nor the Fifth Circuit has specifically decided the issue of whether Section 2 of the Voting Rights Act of 1965

prohibits election practices having a racially discriminatory impact and which perpetuate the effects of past purposeful and intentional discrimination, citing *United States v. Uvalde Cons. Indep. School Dist.*, 625 F.2d 547, 554, fn. 12 (5th Cir. 1980).

■ First, we note that there has been no proof whatsoever offered by the plaintiffs herein of any violation by the defendants of plaintiffs' rights secured by 42 U.S.C. § 1971.

Turning next to the claimed violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, we note that the plurality in *Bolden*, Justice Stewart, joined by Chief Justice Burger and Justices Powell and Rehnquist, held that even assuming without deciding that Section 2 permits a private right of action to enforce it, it is apparent that its language no more than elaborates upon that of the Fifteenth Amendment and that its sparse legislative history makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment. *City of Mobile, Ala. v. Bolden, supra* at 1496. Justice Marshall, joined by Justice Brennan, agreed with the plurality in the above observation but disagreed with their construction of the Fifteenth Amendment. For the same reasons that this Court has rejected the plaintiffs' Fifteenth Amendment violation claim, we likewise reject their Section 2 complaint.

We now turn to the plaintiffs' complaint of the defendants' violation of their Fourteenth Amendment Equal Protection Guarantee.

### C.

Briefly stated, the question before the Court is whether the plaintiffs have proved by a preponderance of the evidence that the majority of voters in the City of Jackson were racially motivated in rejecting the change to the mayor-council form of government and voting to retain or maintain the present challenged mayor-commission form of government with its at-large voting requirement.

Initially, it is important to reiterate that the plaintiffs do not contend that there has been any impediment or hindrance of their ability to qualify for office or to register or vote in the 1977 referendum or in any election in Jackson in the recent past. Nor do they challenge the enactment of the legislation providing for the referendum or challenge the conduct of that election. Their sole Fourteenth Amendment complaint is premised upon the fact that since Negroes are in the minority in the City of Jackson in population, voting age population, and number of registered voters, they cannot elect Negro candidates to serve on the three-man governing body of the city in at-large voting. They contend that this would only be possible if the city were divided into districts or wards with the voters in each district or ward to elect members of the municipal governing body.

■ It is now well established that in order to prevail in a Fourteenth Amendment Equal Protection violation claim plaintiffs must prove that the disputed plan was conceived or operated as a purposeful device to further racial discrimination, *City of Mobile, Ala. v. Bolden, supra* at 1499, and that its purpose was invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. *See White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). This burden of proof is simply one aspect of the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment. *See Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). This principle applies to claims of racial discrimination affecting voting just as it does to other claims of racial discrimi-

nation. *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Wright v. Rockefellar*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964). Thus, the impact of the official action—whether it bears more heavily on one race than another, *Washington v. Davis, supra* at 242, 96 S.Ct. at 2048–49—may provide an important starting point; but where the character of the law is readily explainable on grounds apart from race, as would nearly always be true where, as in the case *sub judice*, an entire system of local government is brought into question, disproportionate impact alone cannot be decisive, and Courts must look to other evidence to support a finding of discriminatory purpose. *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) and *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976).

█ In its original opinion, this Court assessed the plaintiffs' claims in light of the criteria set forth by the Fifth Circuit in *Zimmer v. McKeithen, supra*, which was decided prior to *Washington v. Davis, supra*, and according to the Supreme Court in *City of Mobile, Ala. v. Bolden, supra*, was "decided upon the misunderstanding that it is not necessary to show a discriminatory purpose in order to prove a violation of the equal protection clause, but that proof of a discriminatory effect is sufficient." Unlike the district court in *Bolden*, this Court, after making its specific findings under each of the principal and enhancing factors articulated in *Zimmer*, as mandated by the Fifth Circuit in *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978) (hereinafter referred to as Nevett II), found that the aggregate of the factors articulated in *Zimmer* weighed in favor of the defendants. *Kirksey v. City of Jackson, supra* at 1313.

We found in our original opinion, and reaffirm that finding with even more conviction, that although there is admittedly a past history of official discrimination in the state of Mississippi, incidents of the past have been removed and that the effects of past denial of access have been dissipated with the result that there is present equality of access and effective and meaningful participation by blacks in the electoral process in the City of Jackson under its present form of government. Furthermore, the plaintiffs have failed to prove by a preponderance of the evidence that the city officials of Jackson are unresponsive to the needs of black Jacksonians, but on the contrary, based upon all of this Court's specific findings of fact in its original opinion, we are firmly of the opinion that the governing body of Jackson has in the recent past become, and is now, increasingly and systematically responsive to the interests and desires of the black citizens of the City and is thus representative of all its constituency. *Kirksey v. City of Jackson, Miss.*, 461 F.Supp. 1282 (S.D.Miss.1978). In conclusion, this Court has previously found, and reaffirms its finding, that the plaintiffs have failed to prove that the claimed voting dilution was the result of any invidious discriminatory purpose or intent, and that the aggregate of the *Zimmer* criteria do not point to intentional discrimination as a motivating factor in either the enactment or maintenance of the present form of municipal government and electoral process in Jackson, Mississippi. We thus previously ordered the dismissal of this suit with prejudice at the cost of the plaintiffs, *Id.* at 1314.

We are mindful of the fact that a majority of the Court in *Bolden* has rejected the *Zimmer* analysis which mistakenly held that it is not necessary to show a discriminatory intent in order to prove a violation of the equal protection clause, but that proof of discriminatory effect is sufficient. *City of Mobile, Ala. v. Bolden, supra* at 1502–1503, 1512 (Stevens, J. concurring). Nevertheless, consideration of the *Zimmer* criteria is relevant in considering the question of whether discriminatory intent or purpose has been proved. This Court therefore readopts and reaffirms all of its findings of fact arrived at in its original opinion and concludes that the aggregate of the *Zimmer* criteria strongly preponderates in favor of

the defendants herein; i. e., that the plaintiffs have failed to prove by a preponderance of the evidence, inferentially or circumstantially, any intentional or purposeful racial discrimination against them in either the enactment or maintenance of the at-large voting electoral process in Jackson. This Court cautioned in its original opinion that:

> In determining whether unconstitutional dilution exists ... care must be taken not to disenfranchise the majority because this results in merely replacing one evil with another. It also compartmentalizes the electorate, reinforces the bloc voting syndrome and prevents minority class members from exercising any influence on the political system beyond the boundary of their single-member wards....

*Kirksey v. City of Jackson, Miss., supra* at 1312. This observation comports with the expression by the Supreme Court in *Bolden*.

■ Certainly the equal protection clause of the Fourteenth Amendment which guarantees equal participation in the electoral process to all does not. protect any "political group," however defined, from electoral defeat, does not entail the right to have one's candidate prevail, and does not require proportional representation of races in city government. *City of Mobile, Ala. v. Bolden, supra* at 1504–1507 and 1510, fn. 6 (Stevens, J. concurring).

It has certainly been established that Negro candidates have been defeated in their bids for election in the City of Jackson, but that fact alone does not work a constitutional deprivation. *City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, fn. 15, 97 S.Ct. 555, 564 fn. 15, 50 L.Ed.2d 450 (1977); *Whitcomb v. Chavis,* 403 U.S. 124, 160, 91 S.Ct. 1858, 1877, 29 L.Ed.2d 363 (1971).

The plaintiffs concede on page eleven of their post-trial Proposed Memorandum Opinion filed subsequent to the original trial of this case, that there is no evidence that blacks are currently being discriminated against in voter registration; likewise, this Court found in accordance with the testimony of Mrs. Evelyn Ballard, City Clerk of the City of Jackson for the past thirteen years, that black registration has been in rapid ascendency since passage of the 1965 Voting Rights Act. The Court found that the record is completely devoid of any evidence supportive of any present fear or reluctance by or interference with the efforts of blacks to register, vote or seek public office, which is evidenced by the turn-out among black registered voters in the recent past in the City of Jackson, including the referendum of 1977. This Court therefore concluded that the failure of black candidates to win election in recent city elections prior to 1977 did not result from preclusion of effective participation by blacks in the electoral system because of past discrimination. *Kirksey v. City of Jackson, Miss., supra* at 1291–1292. The Supreme Court in *Bolden* likewise held that

> past discrimination cannot in the manner of original sin condemn governmental action that is not itself unlawful. The ultimate question remains whether discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question.

*City of Mobile, Ala. v. Bolden, supra* at 1503–1504.

This Court finds language in Justice Stevens' concurring opinion to be very appropo to the case *sub judice,* and more particularly his observation in disagreeing with Justice Marshall that the votes cast in an at-large election by members of a racial minority can never be anything more than "meaningless ballots." Justice Stevens stated that he has no doubt that analyses of presidential, senatorial and other state-wide elections would demonstrate that ethnic and racial minorities have often had a critical impact on the choice of candidates and the outcome of elections, and that there is no reason to believe that the same political forces cannot operate in the smaller election districts regardless of the depth of conviction or emotion that may separate the partisans of different points of view.

In our original opinion we noted that the principal named plaintiff, Henry J. Kirksey, candidly testified that white candidates for election to the Jackson City Council actively seek the black vote, and that this is what makes them responsive to the needs of blacks. This Court found that in view of the large percentage of black voters in Jackson, which is really the balance of political power in its municipal elections, Mr. Kirksey's observation was correct. *Kirksey v. City of Jackson, Miss., supra* at 1313. This observation is buttressed by the testimony of Ms. Katheryn Hester, one of the co-chairmen of proponents of the proposed change of form of Jackson's government to mayor-council, that in order to "pass anything in Jackson it is necessary to have the black vote."

The Supreme Court in *Bolden* has rejected the argument of the plaintiffs herein that they are entitled to have the City of Jackson divided into wards which would permit them to elect Negro councilmen from certain "safe" Negro wards. This Court is impressed by the observation by Justice Stevens in his concurring opinion in *Bolden* that an interpretation of the Constitution which afforded one kind of political protection to blacks and another kind to members of identifiable groups would itself be invidious; and the fact that a political group has its own history, has suffered its own special injustices and has its own congeries of special political interest, do not make one such group different from any other in the eyes of the law. Members of each go to the polls with equal dignity and with equal rights to be protected from invidious discrimination. He also quoted from Justice Douglas' dissent in *Wright v. Rockefellar*, with whose observations this Court agrees, that:

> Racial electoral registers, like religious ones, have no place in a society that honors the Lincoln tradition—of the people, by the people, for the people. 'Here the individual is important, not his race, his creed or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. . . . The racial electoral register system weighs votes along one racial line more heavily than it does other votes. That system, by whatever name it is called, is a devisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense. Of course, race like religion plays an important role in the choices which individual voters make from among various candidates. But government has no business designing electoral districts along religious lines. . . .
>
> When racial or religious lines are drawn by the State, the multi-racial, multi-religious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal it should find no footing here.' 376 U.S. 52, 66–67, 84 S.Ct. 603, 611, 11 L.Ed.2d 512.

*City of Mobile, Ala. v. Bolden, supra* at 1511, fn. 10.

This Court deems it necessary to summarize testimony of the witnesses relative to the 1977 referendum which has been attacked by the plaintiffs. Mr. Fred Banks, a black attorney in the City of Jackson and one of Hinds County's Representatives in the Mississippi Legislature, who maintained that race was the motivating factor in the defeat of the referendum in question, admitted on cross-examination, and it is undisputed, that then Mayor Russell Davis of the City of Jackson openly and actively supported the proposed change in the form of government to mayor-council. Furthermore, he testified that Commissioner Thomas B. Kelley, who opposed the change, expressed no racial reason or motivation therefor, but preferred and advocated an expanded commission form of government consisting of more members.

The named plaintiff, Henry J. Kirksey, stated that he knew of no white voter who made any statement or expressed any reason for voting to retain the mayor-commission form of government based on race in order to keep blacks out of government, and admitted that Commissioner Kelley probably opposed the change because it would result in diminution of his salary. This is supported by Kelley's statement that if the change was effectuated he would be a candidate for mayor.

The remaining Commissioner, Douglas W. Shanks, took no position in the referendum and testified that race played no part in his disagreement with certain aspects of the structure of the mayor-council form of government, but advocated the expansion of the commission form of government. He further stated that the fact that the proposed change would provide opportunities for black representation played no part in his decision to take no public position on the referendum.

On cross-examination, Kirksey opined that it was reasonable to assume that "many of those who opposed the change did so because it was something new and they did not wish to change a form of government which they knew they had." He further testified that there was no impairment or discouragement of blacks in voting on the referendum of 1977, and conceded that he made public statements which were quoted in the news media prior to the referendum that "it did not stand a ghost of a chance," that "it was dead;" and that "if the referendum did not pass he would take legal action to change Jackson's form of government." He admitted that he was known by everyone as a strong civil rights advocate, and that some Jackson blacks, including a Mr. Mitchell, a professor at Jackson State University, publicly criticized the mayor-council form of government prior to the referendum.

The number of registered voters in the City of Jackson at the time of the 1977 referendum consisted of 69,934 whites and 26,898 blacks, and only 6,450 blacks voted therein, meaning that 20,448 registered black voters did not cast their ballots in the referendum, which was defeated by a vote of 14,935 to 11,497. Seventy-two per cent (72%) of the whites who voted opposed the change and 28% favored it, whereas 98% of the blacks who voted, voted for the change. White voters comprised 47.4% of those who voted for the proposed change in the referendum. If approximately 4,000 more of the 20,448 registered black voters who did not vote, would have voted and had voted at or near the percentage of the vote cast by black voters in favor of the change, namely 98% thereof, the proposed change of government would have passed. The total voter turn-out was extremely low, that is, 28% of the registered voters, as compared to 51.5% of registered voters who later voted in a similar type referendum in Hattiesburg, Mississippi.

Mayor Russell Davis of the City of Jackson, testified that although he believed, based solely on past actions, that some individuals and some groups opposed the change for racial reasons, he could point to no specific evidence to support this belief. He testified that although race was not brought out as an issue in the referendum, it could possibly have played a minor part in its defeat, but it did not play a significant part. It was his opinion that a number of people opposed the change because they did not understand it. He also verified that there was a great deal of confusion among the people with reference to the issues involved in the referendum.

In any event, the governing body of the City of Jackson did not make the decision or control the decision whether the referendum of 1977 passed, but that decision was made by the voters of the City of Jackson in a properly conducted referendum. The plaintiffs made no showing whatsoever of the size of the group who opposed the change, the extent of its political influence nor the extent of their activities.

At this supplemental trial or hearing, the plaintiffs called several lay witnesses, including Henry J. Kirksey, Fred L. Banks, Jr., Kane Ditto, a white attorney who was co-chairman of the group conducting the

campaign in favor of the change, and Earl Fortenberry, Jr. and Gery A. Cummings (whose testimony was admitted through a deposition). Each testified that in his lay opinion an undetermined number of Jackson voters voted against the proposed change because of racial reasons. Ditto, Fortenberry and Cummings based their opinions on the fact that a small number of people with whom they talked referred to racial considerations or asked questions concerning race during the time the witnesses were procuring petition signatures which were a prerequisite to the calling of the referendum.

This Court gives very little weight to their opinion testimony and finds it to be nothing more than speculative. This testimony does not ascribe racial motivation to the electorate who voted against the change merely because some few alluded to race principally by asking questions concerning the extent of potential black representation in the proposed mayor-council form of government. As a matter of fact, Mr. Ditto based his opinion primarily on the fact that he felt that those who expressed reasons other than race for opposing the change were insincere in those statements. Ditto further admitted that he gave the news media a statement immediately after the referendum that its defeat was attributable to voter confusion.

The above testimony fails to prove any racially discriminatory purpose or motivation by the electorate who voted to retain the mayor-commission form of government, assuming that this is a legitimate inquiry by the Court. *See Village of Arlington Heights v. Metropolitan Housing Development Corp., supra* at 268, fn. 18, 97 S.Ct. at 565, fn. 18. In *Arlington Heights* there was evidence that some of the zoning hearings focused on the desirability or undesirability of having racially integrated housing at the location in question. The Supreme Court affirmed the District Court's finding that the fact that some opponents of the housing development may have been opposed to minority groups did not warrant the conclusion that this motivated the defendant. Likewise, the Supreme Court in *Bolden* con-

cluded that racial statements by some Alabama legislators who opposed giving the electorate of Mobile the opportunity to hold a referendum on changing the city's form of government did not suffice to prove the requisite intentional and purposeful racially discriminatory motivation constituting a violation of the plaintiffs' Fourteenth and Fifteenth Amendment rights.

In searching for direct evidence of racial motivation for the retention of the mayor-commission form of government, this Court was very much impressed by and gives great weight to the testimony of the witness, Katheryn Hester, a white female law student who was called as a witness by the defendants. Ms. Hester, who was employed by the Research and Development Center of the State of Mississippi, had been involved in many political campaigns on the national, state, and local levels. Ms. Hester did consulting work for a Dr. Johnson, who was a black candidate for Governor of Mississippi in 1979, and she also worked for two black candidates in 1979 who were respectively elected Supervisor and a State Legislator of Hinds County. Ms. Hester, a member of the Urban League, undertook an extensive study to determine the form of municipal government that would be best for Jackson and concluded that the mayor-council was the best form. In 1972 she tried unsuccessfully to have the Mississippi Legislature pass enabling legislation to permit Jackson voters to vote on a change of their form of government to mayor-council. In 1976 she was the principal motivating force in bringing the Mississippi Legislature to enact the enabling legislation to permit all Mississippi cities to hold referenda on the change of their forms of government of every kind to the mayor-council form.

Prior to that time, in 1971, she and Kane Ditto were co-chairmen for the Chimneyville Society, a predominantly white organization dedicated to the study and promotion of the best form of government for the City of Jackson. She worked with study committees of the League of Women Voters, the Jackson Chamber of Commerce, the N.A.A.C.P., all of which were predominant-

ly white organizations with the exception of the N.A.A.C.P., with a view of changing Jackson's form of government to mayor-council, because she felt that it was far superior to the mayor-commission form. In 1975, she made a thorough search of the polling books of the City of Jackson to determine which voters had voted in the last four elections and concentrated her efforts on convincing them of her belief.

In October, 1975, she began efforts to have the legislation enacted to permit all Mississippi municipalities to change their forms of government to mayor-council and was successful in having the legislature lower the number of petitioners required to initiate the call of referenda for that purpose. Initially, the plan was to have the referendum placed on the ballot for the general election of 1976 but when the petitions were presented to the Jackson City Clerk it was discovered that the requisite number of qualified registered voters was lacking. Therefore, it became necessary to secure additional signatures which in turn required this referendum of 1977 to be submitted in a special election.

Ms. Hester's task was difficult in view of the fact that many people in Southwest Jackson were very displeased that their area was being annexed into the City of Jackson without their being given the right to vote, and subsequently, this annexation became as much an issue as the proposed change in government.

Ms. Hester stood in front of grocery stores at shopping centers every day after work and almost all day on Saturdays over a six week period in her concentrated effort to obtain the necessary signatures of qualified voters on the required petitions for the holding of the referendum. She spoke to approximately twenty-five clubs and civic organizations, advocating the adoption of the mayor-council form of government.

Initially, it was proposed that seven council members be elected, but when asked by one group to increase the number to nine, she agreed. She attended several meetings of citizens of the annexed area of Southwest Jackson who felt that if the form of government was not changed that their area would not remain annexed to the city. This reason alone motivated them to oppose the proposed change.

Ms. Hester and Mr. Ditto worked in the campaign for change of government without pay. They originally tried to divide their duties equally, but Ditto became responsible for raising money while Hester was responsible for running the campaign, supervising all campaign workers, and coordinating their work with other groups. In addition, she was in charge of all advertisement and also participated in the preparation of two of the brochures (admitted as evidence) which were utilized in support of the proposed change. The proponents had only a limited number of volunteers and utilized them to address and mail brochures, rather than go door to door to campaign. They sent out approximately 20,000 brochures to precincts which Hester felt would turn out to vote and support the change. The proponents were short of funds, and most of their contributions came from white citizens of Jackson.

Immediately after the formal announcement of the campaign for the change was made on August 6, 1976, on August 9, 1976 the named plaintiff herein, Henry J. Kirksey, called a news conference and "blasted" the organization spearheading the proposed change charging that it did not include blacks. He later found out that was erroneous inasmuch as twenty of the sixty-six member steering committee were blacks, including Fred Banks, Jr., Horace Buckley and Doug Anderson. All of these men are black members of the Mississippi Legislature representing Hinds County, of which Jackson is the county seat. When Mr. Kirksey discovered this fact he made a public statement that the steering committee included "hand picked blacks." Hester debated Kirksey on Channel 3 television on the "Probe" program. Kirksey used a plat of Northeast Jackson during the program and made the statement that the proposed change was merely a Northeast Jackson scheme. Ms. Hester testified that this latter charge by Kirksey very seriously affect-

ed the campaign for the proposed change of government because Northeast Jackson residents are the most wealthy, are political leaders in Jackson, and are looked upon with suspicion by other residents of the City of Jackson. Mr. Kirksey's injection of the race issue, and of sectionalism, and his criticism of the proponents for the proposed change to the mayor-council form of government, which he now espouses, was disastrous. In the opinion of Ms. Hester, Mr. Kirksey's actions seriously affected the chances for a successful campaign because it discouraged many blacks from voting in the 1977 referendum. She testified, and Mr. Kirksey admitted in his testimony, that he publicly stated that the referendum did not "stand a ghost of a chance of passing but that blacks should vote in it to show what their preference was in any event."

Ms. Hester testified that she at no time encountered any opposition to the change of government based on race, and that none of the opponents of the change ever mentioned or used the race issue in opposition thereto. It was her opinion, and the Court agrees, that race did not motivate those who voted against the change, with perhaps the exception of a very few.

There was extensive newspaper advertisement by the proponents and opponents of the change prior to the referendum, but most of the exhibits which were admitted into evidence were news items written by reporters. Two of them were editorials which appeared in the two Jackson papers immediately prior to the referendum opposing the change for the reason that too many things were uncertain and that more time was needed to study the proposed change.

The plaintiffs attempted to prove through the testimony of Dr. Rommel Benjamin, a sociology professor at Jackson State University, that certain "freighted words" contained in newspaper articles carried racial connotations which affected the outcome of the referendum. Actually, Dr. Benjamin only used race as a factor in his analysis and did not consider any of the other possible opposing factors which were argued by those opposing the proposed change. His study of the 1977 referendum, which was conducted in 1980 shortly before this trial, was based upon his submission of various "freighted words" taken from the articles, most of which were written by news reporters. Dr. Benjamin's conclusions were based solely on responses made by twelve black graduate students of Jackson State University, although he conceded that responses of whites to the "freighted words" differed from those of blacks. The reason given for the manner in which he conducted the test was because time and circumstances did not permit. Furthermore, only seven per cent of the newspaper articles contained the alleged "freighted words" and Dr. Benjamin admitted that he only analyzed the "freighted words" from the standpoint of effect and not intent or purpose. Dr. Benjamin's opinion concerning his testing deserves very little weight, if any, because of the above manner in which it was conducted and the fact that the testing was performed in 1980, over three years subsequent to the time that the words appeared. Also, his study consisted of an incomplete or inadequate analysis, that is, from the standpoint of race only, and not as a whole, to determine the causes or factors that contributed to the defeat of the proposed change.

The plaintiffs' expert witnesses, Dr. James Loewen and Dr. Gordon Henderson, analyzed the 1977 referendum only from the standpoint of race. Dr. Loewen made a statistical study of voting results by race (Exhibit P–186) similar to that described by Dr. Henderson in his testimony in the original trial in 1977. Dr. Henderson found a high correlation between black votes and votes in favor of the change to the mayor-council form of government, but concluded that white voting patterns were divided. On the other hand, Dr. Loewen found a high correlation between black votes and votes for the proposed change as well as white votes and votes for the status quo. The correlation analyses performed by the expert witnesses were designed to show association between variables, but the core of the inquiry in a case of this type is motivation. Association is not equated with cau-

sation, and thus, causation may not be equated with motivation. Thus, proof of an association between variables by means of a correlation analysis is not conclusive proof of motivation.

The only witness who performed a complete and thorough analysis in order to determine the cause or causes which led to the defeat of the referendum was Dr. Larry Powell, the defendants' only expert witness. Dr. Powell, who obtained a doctoral degree in communications from the University of Florida, specializing in political communication, political campaigns, voting behavior, and empirical methodology, analyzed the 1977 referendum by examining voting results, newspaper articles, advertisements, and campaign literature. Based upon his observation of all evidence adduced, he was of the opinion that several factors led to the defeat of the proposed change. In his opinion the major deciding factors were confusion among the voters and their desire to maintain the status quo. This opinion is consistent with the reasons given by Ms. Hester and Mr. Ditto. Dr. Powell was of the opinion that race did play a part among blacks who voted for the change inasmuch as the entire campaign among blacks stressed race and the potential benefits to blacks, principally the ability to elect blacks to the city council. Dr. Powell was of the opinion that these racial arguments, which were extensively made to blacks by supporters of the mayor-council form of government probably resulted in the high percentage of black votes in favor of the change. On the other hand, he did not consider race as a motivating factor for the vote against the change. He found that almost 50% of the votes cast in support of the proposed change were "white votes" and that the voter turnout was low to moderately low. He was of the opinion that if race, a volatile issue, would have been a real issue in the campaign it would have resulted in a much higher white voter turnout and perhaps a higher percentage of white votes in favor of the retention of the mayor-commission form of government.

There was a newspaper advertisement in the official publication of the White Citizens Council which did allude to race, but which was expected from a racist group responding to the racial issue injected into the campaign by the proponents. Expressions of this type by this small group does not constitute the necessary proof to support or warrant a finding of racial motivation on the part of the majority of voters who voted to retain the mayor-commission form of government. *See City of Mobile, Ala. v. Bolden, supra* at 1513.

In an apparent change of position from that taken by the plaintiffs in the original trial of this cause in 1977, they now contend that the voter turnout in the 1977 referendum was high. This Court, however, finds that this turnout was low to moderately low for a referendum in the City of Jackson, and certainly was very low compared to the referendum held subsequently on the proposed change of government to mayor-council form in Hattiesburg where 51.5% of the voters cast their ballots.

This Court agrees with the opinion and conclusions of Dr. Powell and Ms. Hester, that race was not a motivating factor for the defeat of the proposed change in the 1977 referendum. The plaintiffs contend that this Court must conclude that race was a motivating factor or the principal motivating factor in the defeat of the proposed change of government because there were no other reasons for the majority of the voters rejecting the proposed change. We reject this argument and conclude as did Dr. Powell, that the result of the referendum is more likely explained as an artifact of campaign strategy rather than the result of racial motivation.

The proponents of the mayor-council form divided their campaign between the predominantly black and the predominantly white communities. Because of the black leadership taking the campaign to churches and black organizations in the black community and the use of handbills injecting the racial issue into the campaign, the proponents were successful in having 98% of the blacks who did turn out vote in favor of

the change. However, the black turnout was unexpectedly low because of apathy and the public utterances and "blasting" of the proponents' efforts.

On the other hand, there was little precinct organization by the proponents in the white community, and thus they failed to adequately address the idealogical fears that the mayor-council form would produce a dictatorial mayor as well as the fact that the mayor and councilmen could set their own salaries at their first meeting.

In agreeing with Dr. Powell's and Ms. Hester's testimony, we find that the principal factors which led the voters to retain the commission form of government in Jackson were: (1) the confusion and uncertainty in the minds of voters; (2) the natural tendency of voters to vote to retain the status quo; (3) the 1977 referendum was brought before the Jackson electorate by way of petition instead of pursuant to statutory law; (4) the fear that the mayor-council form would create a dictatorial mayor, in addition to the fact that voters believed that the incumbent mayor was already a "strong" mayor, was openly supporting the change and running for re-election; (5) many voters preferred to choose several other possible forms of government; (6) many voters opposed the idea of part-time council members who would have no permanent offices, phones, or secretaries, and could not be contacted by their constituents; (7) the opinion that councilmen would only be rubber stamps for a strong-willed mayor who would be dictatorial; (8) the opinion that only rich people, that is, those who could afford to invest the time, and not the poor, could serve as council members at low salaries; (9) New York City had a mayor-council form of government and had gone bankrupt, which was brought to the attention of the electorate; (10) many thought that the mayor could fire city department heads at will and hire all personnel; and (11) opposition was initially expressed by some blacks that they would make better full-time than part-time city officials.

In addition, Dr. Powell testified that the campaign tide shifted in the newspaper articles from the proponents to the opponents near the end of the campaign and shortly before the referendum. He also testified that editorials appeared in both Jackson newspapers opposing the proposed change because of its uncertainty and the need for more time to study it.

In view of the foregoing findings, the evidence in the record concerning the historical background of the 1977 referendum does not support the plaintiffs' contention that racially discriminatory intent was a motivating factor for the defeat, although it probably was a motivating factor among those, especially the blacks, who supported the proposed change. In addition to the historical background inquiry, *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra* at 266, 97 S.Ct. at 563–64, delineated four other factors to be considered in determining whether discriminatory intent or motivation was present and has been proved: (1) impact of the official actions; (2) the specific sequence of events leading up to the challengers' decision and any departures from the normal procedural sequence; (3) any substantive departures; and (4) the legislative or administrative history.

In addressing the "impact" inquiry, it must be determined whether the retention of the commission form of government here bears more heavily on one race than another. It is necessary to review all the evidence of record which reflects the effect of the commission form of government with at-large voting on the black community. This inquiry requires more than the consideration of the plaintiffs' contention that black candidates cannot be elected and black voters cannot elect candidates of their choice under the present system.

In considering "impact", this Court made the detailed meticulous analysis of criteria established by the Fifth Circuit in *Zimmer v. McKeithen, supra,* and found clearly that the governing officials of the City of Jackson were very responsive to the needs and interest of the black community. Thus the

"adverse impact" which the district court found in Mobile, Alabama, was and is not present in the City of Jackson. Impact may provide an important starting point and is relevant, but standing alone, it is not determinative. *See Village of Arlington Heights v. Metropolitan Housing Development Corp., supra* at 266, 97 S.Ct. at 563–64. In view of this Court's previous findings and its original opinion, our ultimate finding on this issue must be and is in favor of the defendants.

■ Addressing next the subject of "specific sequence of events leading up to the challenged referendum and any departures from the normal procedural sequence," plaintiffs contend that evidence of discriminatory intent may be found in the results of the 1969 and 1970 municipal elections in Jackson. We are of the opinion that the focus of this inquiry is too broad, and that the inquiry should be directed to the "specific sequence of events leading up to the challenged decision." *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra* at 267, 97 S.Ct. at 564. This Court has already held that the referendum was properly conducted pursuant to Mississippi law, that the Mississippi Legislature passed enabling legislation permitting this referendum, that preliminary statutory requirements were complied with, and that the proposed change was defeated by the electorate in a properly conducted election in which blacks were freely permitted to exercise their franchise. The plaintiffs' sole proof in support of this allegation consists of a Section 5 objection letter from J. Stanley Pottinger, Assistant Attorney General of the United States, to the city attorney of Jackson dated December 2, 1976. (Exhibit P–170). Plaintiffs likewise evidently contend that in view of the Section 5 objection, residents of the annexed area had not been permitted to vote in the municipal election. Examination of the evidence completely disposes of any contention that the 1976 annexation evinces discriminatory intent. Former Mayor Russell Davis, who testified for the plaintiffs on their Motion for Preliminary Injunction, stated that racial discrimination was not an issue in the annexation proceeding, but that the city had been engaged in an effort to annex the area in Southwest Jackson for approximately seven years. Davis testified that the city took in every citizen that it could, black and white. Furthermore, Jackson was attempting to work with the Justice Department and no discriminatory purpose was present. This is evidenced by Pottinger's letter of December 2, 1976 which recited that the city was including all eligible black areas in the annexation, and that the Justice Department's analysis did not disclose any racially discriminatory motivation associated with this annexation. The Justice Department did not object to any of the citizens in the annexed area voting, and thus, they did vote in the 1977 referendum and have voted since in all municipal elections, as evidenced by the testimony of Mrs. Evelyn Ballard, Jackson City Clerk.

Moving to the inquiry concerning "departures from the normal procedural sequence," the next subject of inquiry under *Arlington Heights*, the procedure prescribed by Mississippi law was followed in holding the referendum, and there is no evidence of record which indicates any departure whatsoever from the prescribed procedural sequence in the conduct thereof. Therefore, proof of discriminatory intent or purpose is not supported by any proof of any departure from the normal procedural sequence. In *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra* at 267, 97 S.Ct. at 564, the Supreme Court held that "substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." Plaintiffs contend that a substantive departure is demonstrated by the absence of an adequate non-racial reason for rejecting the change of government, relying principally on the testimony of Dr. Henderson that the commission form of government was declining in popularity across the United States and was neither particularly responsive nor particularly efficient. This Court has rejected this contention.

In *City of Mobile, Ala. v. Bolden, supra* at 1496, (fn.7), 1513, the plurality as well as Justice Stevens noted that the at-large election system utilized in Jackson was the same as that followed by literally thousands of municipalities and other governmental units in the United States. The plurality noted that at-large elections in place of ward voting had recently been universally heralded as a praiseworthy and progressive reform of corrupt municipal government, and

> where the character of a law is readily explainable on grounds apart from race, as would nearly always be true where, as here, an entire system of local governance is brought into question, disproportionate impact alone cannot be decisive, and courts must look to other evidence to support a finding of discriminatory purpose. *City of Mobile, Ala. v. Bolden, supra* at 1501.

The record of this case contains no evidence of any "substantial departures" which support a finding of discriminatory intent. In this Court's considered opinion, Jackson's choice to retain its commission form of government is definitely supported by wholly neutral justifications.

█ The last subject of inquiry articulated by *Village of Arlington Heights* is determining whether discriminatory intent is present in the legislative or administrative history. Since we are dealing with a referendum, the evidence does not include a legislative history of the type spoken to by the Supreme Court in other cases, such as *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Nevertheless, considerable evidence was presented with reference to advertisements in the news media by proponents and opponents to the change as well as public discussions thereof. We have already held and now reaffirm our conclusion that the evidence of record does not preponderate to establish that racial discrimination was a motivating factor in the retention of the commission form of government in Jackson, i. e., does not prove that the decision of Jackson's electorate was substantially influenced or motivated thereby. *See Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). In any event, the issue of race was injected by the proponents of the change, and the racial fires were not only lighted but fanned by them in an attempt to influence the black electorate to vote and support the proposed change. In sum, the plaintiffs have utterly failed to carry their burden of proving that discriminatory purpose was a motivating factor in either the enactment, adoption, or retention of the present form of municipal government with its at-large electoral system or requirement in Jackson, Mississippi.

## VI.

### THE AFFIRMATIVE DEFENSE

Assuming arguendo that the enactment and adoption of the challenged system in 1912 and its retention since that time were motivated in part by a racially discriminatory purpose, shifting to the defendants the burden of establishing that the same decisions would have resulted even had the impermissible purpose not been considered, this Court finds that not only the preponderance of the credible evidence but the overwhelming credible evidence establishes that the present form of government would have been enacted and adopted in 1912 and would have been retained in the referendum of 1977. *See Mount Healthy School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270–271, fn. 21, 97 S.Ct. 555, 566–567, 50 L.Ed.2d 450 (1977). As previously discussed herein, in 1912 beginning with Galveston, Texas, many cities all over the United States began adopting the commission form of government, influenced by its promise of more efficiency, less corruption, and better representation, particularly in view of the fact that the aldermanic

government which existed in most cities had failed to adequately serve the needs of the citizens. This failure was because of various complaints including those of various aldermen perpetuating themselves in office through political favors bestowed by them upon the residents of their respective wards, as well as graft and sectionalism resulting from influence wielded by special interest groups in each of the wards. Apparently the commission form of government was performing well in other cities, and the citizens of Jackson desired to change their government to one which would better serve their interests. Thus, even in the absence of the claimed racially discriminatory purpose, we find that Jackson would have adopted the commission form of government in 1912.

Turning to the 1977 referendum, we are of the opinion that the eleven reasons previously specified herein for the failure of the voters to approve the proposed change to mayor-council form of government, aside from any racially discriminatory purpose, would have caused the rejection of the change and the retention of the commission form of government.

## VII.

### CONCLUSION

Based upon the foregoing findings of fact and conclusions of law as well as those contained in our original opinion, which we now readopt and reaffirm, we are of the opinion that the defendants are entitled to a judgment herein dismissing the plaintiffs' case at their cost. Accordingly, the defendants shall prepare and present to this Court a Final Judgment conforming with this Memorandum Opinion, approved as to form by counsel for both sides, dismissing this action with prejudice at the cost of the plaintiffs.